Thomas TAKE and Janice
Take, Petitioners,

v.

COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Respondent.

No. 85–7614.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 2, 1986.

Decided Nov. 13, 1986.

William Van Doren, Anchorage, Alaska, for petitioners.

Roger M. Olsen, Martha B. Brissette, Dept. of Justice, Washington, D.C., for respondent.

---

Before SNEED, KENNEDY and WIGGINS, Circuit Judges.

KENNEDY, Circuit Judge:

Thomas Take, and his wife Janice, appeal from the Tax Court's decision that payments received by Take in 1979 and 1980 were not excludable from income on their joint tax returns as "amounts received under [a] workmen's compensation act[ ]." I.R.C. § 104(a)(1) (1982).

Take was employed for about ten years as a fire fighter with the municipality of Anchorage, Alaska. Before that, he served as a volunteer fire fighter in and near Anchorage. Take was involved in fighting thousands of fires. On one occasion, he was on a fire line for seventy-two hours. He was twice overcome by smoke or toxic fumes. In the Anchorage department, he was promoted through the ranks to battalion chief and retired with the rank of captain.

In approximately 1977, Take discovered that he had an irregular heartbeat. After two years of medical care, his doctor advised him to change his profession, and to have a pacemaker installed. On May 29, 1979, Take's physician wrote a letter to the Chief of the Anchorage Fire Department recommending medical retirement.

The municipality of Anchorage had enacted, by ordinance, a Retirement Plan for Police Officers and Fire Fighters. Included in this plan were benefits for retirement (Anchorage, Alaska, Administrative Code § 3.85.030 (1977)), occupational disability (Anchorage, Alaska, Administrative Code § 3.85.040 (1977)), and non-occupational disability (Anchorage, Alaska, Administrative Code § 3.85.050 (1977)). Benefits for occupational disability were awarded as follows:

*3.85.040 Occupational disability.*

A. A member who, due to an occupational disability, is unable to perform his assigned duties, shall receive a monthly pension of 66⅔% of his gross monthly compensation at the time of

disability.... The Retirement Board shall determine whether an occupational disability exists based upon medical reports and other evidence satisfactory to the Retirement Board. The Retirement Board shall in all instances recognize the below provisions; however, consideration will not be limited to these provisions:

1. Any injury received while performing official duties for the Municipality of Anchorage which renders a member incapable of performing normal assigned duties will be construed as an occupational disability....

2. The cumulative effect of the constant contact with that portion of the citizenry which suffers from infectious tuberculosis, the frequent strenuous duties encountered in performing daily assigned duties as police officers and fire fighters, and of the inhalation of smoke, toxic gases, chemical fumes and other toxic vapors on the heart, lungs, and respiratory system shall be construed as an injury received or disease contracted while in the performance of duty; therefore, heart, lung and respiratory system illnesses shall be construed as occupational disabilities. A retired member hired on or after July 1, 1977 receiving benefits under Section 3.85.030 or Section 3.85.050 shall not be eligible for occupational disability benefits under this section if heart or respiratory disability occurs after the seventh anniversary of the member's retirement.

On June 11, 1979, the city of Anchorage approved temporary occupational disability benefits for Take. After a physician's examination revealed that Take's heart condition prevented him from performing the duties of a fire fighter, particularly without medication or a permanent pacemaker, the municipality approved his permanent disability retirement benefits. Take received retirement benefits of $15,385.04 during 1979 and $24,669 in 1980. Neither pay-

ment was reported as income on the joint returns filed in 1979 and 1980.

The Commissioner determined deficiencies of $7,481.17 for 1979 and $8,194 for 1980. The Commissioner also determined that the Takes owed almost $800 in addition to their taxes under I.R.C. § 6653(a) for negligence in filing their 1979 and 1980 returns.

Take sought review in the Tax Court. He moved for summary judgment on the ground that the occupational disability benefits he received were excludable from income under I.R.C. § 104(a)(1) as amounts received under a workmen's compensation act. The Commissioner opposed Take's motion, and also sought summary judgment, contending that the ordinance under which the benefits were received was not a workmen's compensation statute within the meaning of section 104(a)(1).

The Tax Court denied both motions for summary judgment. *Take v. Commissioner*, 82 T.C. 630 (1984). Its most significant holding was that amounts received under section 2 of the Anchorage ordinance could not be excluded from income under I.R.C. § 104(a)(1). According to the Tax Court, an ordinance that makes no distinction between occupational diseases and ordinary diseases of life is not "in the nature of a workmen's compensation act" as that term is used for the purposes of the exemption under section 104(a)(1) of the Internal Revenue Code. *Take*, 82 T.C. at 636. Section 2 of the Anchorage ordinance establishes an irrebuttable presumption that heart, lung, and respiratory illnesses are occupationally related even though "risk [of such illnesses] has not been considered sufficiently distinguished from the risk of such disease in the population as a whole to justify an irrebuttable presumption of occupational causation." *Id.* The Tax Court did not find that a statute containing an irrebuttable presumption establishing occupational causation could never qualify under section 104(a)(1), but only required a "more definitive relationship between the occupation and the injury or sickness" than

the connection drawn by section 2 of the Anchorage ordinance. *Id.* at 636 n. 14.

The Tax Court denied the Commissioner's motion for summary judgment because there was a factual issue in the case. The issue was whether Take had received his benefits under section 1 of the ordinance, which qualified for the exclusion under I.R.C. § 104(a)(1) because it required proof of occupational causation, or under section 2, which did not meet that standard. The Tax Court later held that Take had failed to satisfy his burden of proof as to the statutory origin of his benefits, and decided the issue in favor of the Commissioner. *Take v. Commissioner*, 85 T.C.M. (P–H) 1717, 1719 (1985). Take's disability retirement benefits were held not to be excludable from income. The Tax Court refused, however, to sustain the additions to tax for negligence because it found that Take "could reasonably have believed that the benefits were excludable." *Id.*

Take contends that the Tax Court erred in failing to credit the presumption of occupational causation enacted in the Anchorage ordinance. He argues that the enactment of irrebuttable presumptions in occupational disability statutes does not alter the status of such laws as "in the nature of workmen's compensation acts." It is said the presumption eliminates problems of proof and distributes compensation more efficiently to people who have, for the most part, suffered work-related injuries. The Tax Court's decision, Take claims, was the type of medical judgment that the enactment of presumptions is designed to avoid. These contentions relate to the Tax Court's initial denial of summary judgment. The only challenge asserted to the Tax Court's second decision granting judgment in favor of the Commissioner is that the Tax Court should have permitted Take to show that his injury was in fact work-related.

We treat the Tax Court's decision that section 2 of the Anchorage ordinance was not a statute "in the nature of a workmen's compensation act" as a ruling of law subject to de novo review. *See Sennett v. Commissioner*, 752 F.2d 428, 430 (9th Cir.

1985) (reviewing construction of statute on stipulated facts as question of law); *Rutter v. Commissioner*, 760 F.2d 466, 468 (2d Cir.) (per curiam) (reviewing as issue of law lower court's determination of local statute's status under section 104), *cert. denied*, —— U.S. ——, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985). We note, however, that the Commissioner has latitude in the interpretation of the Internal Revenue Code, *see Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (requiring deference to agency's construction of statute it has been entrusted to administer), and that the Tax Court's opinions bearing on the Internal Revenue Code are entitled to respect because of its special expertise in the field. *Magneson v. Commissioner*, 753 F.2d 1490, 1493 (9th Cir.1985).

The Internal Revenue Code provides for the exclusion from income of certain payments received as "compensation for injuries or sickness." I.R.C. § 104. Payments will qualify for the exclusion under section 104 if deemed "amounts received under workmen's compensation acts as compensation for personal injuries or sickness." I.R.C. § 104(a)(1). The Commissioner's regulations interpret this section also to exclude amounts paid "under a statute in the nature of a workmen's compensation act which provides compensation to employees for personal injuries or sickness incurred in the course of employment." Treas.Reg. § 1.104–1(b) (1960).

The Code also provides for exclusion from income of certain "amounts received under accident and health plans." I.R.C. § 105. At all times relevant to this litigation, section 105 provided for the exclusion from income of occupational disability payments, provided that certain preconditions were met. Prior to 1976, section 105(d) permitted a taxpayer to exclude occupational disability payments up to $100 per week if the payments constituted "wages or pay-

ments in lieu of wages for a period during which the employee [was] absent from work on account of personal injuries or sickness." I.R.C. § 105(d) (1954), *amended by* I.R.C. § 105(d) (1976). After 1976 these payments would only be excludable if the taxpayer was "absent from work on account of permanent and total disability," which was defined restrictively to mean that the taxpayer was "unable to engage in any substantially gainful activity." Tax Reform Act of 1976, Pub.L. No. 94–455, § 505, 90 Stat. 1520, 1566 (1976).[1] Thus section 105, as it existed during the relevant period, provided a far more limited exclusion for occupational disability payments than the exclusion under section 104 provided for amounts received under workmen's compensation acts. Take does not contend that he is entitled to an exclusion under section 105.

Section 105(e) provides that "amounts received from a sickness and disability fund for employees maintained under the law of a State" are to be treated under the more restrictive provisions of section 105. For tax purposes, then, states and municipalities have the incentive to mask laws providing for sickness or disability payments as "workmen's compensation acts" in order to avoid the federal tax bite. If the federal government were required to accept local characterizations of such laws, the intent of Congress to distinguish between workmen's compensation and other payments might be frustrated. The distinction between sections 104 and 105 thus requires scrutiny of the law that is the source of such payments in order to determine whether section 104 is called into play. *See, e.g., Waller v. United States*, 180 F.2d 194, 196 (D.C. Cir.1950) (distinguishing between workmen's compensation and disability retirement provisions); *Gallagher v. Commissioner*, 75 T.C. 313, 316 (1980) (distinguishing between workmen's compensation and "hazard pay"); *Murphy v. Commissioner*, 20 T.C. 746, 748 (1953) (distin-

---

**1.** In 1983 section 105(d) was repealed entirely. Social Security Amendments of 1983, Pub.L. 98–21, § 122, 97 Stat. 65, 87 (1983).

guishing between workmen's compensation and retirement pay).

Workmen's compensation laws are meant to provide sure and swift compensation to workers who incur injury or sickness in the course of their employment. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 80, at 573–74 (5th ed. 1984) (hereinafter Prosser & Keeton). They provide an alternative to litigation based on negligence, in that employers are held strictly liable for work-related injury and sickness.

The most distinctive feature of workmen's compensation plans is their limited scope—such laws are meant to apply only to injuries or sickness incurred by virtue of employment. *See* 1B A. Larson, The Law of Workmen's Compensation § 41.32, at 7–366 (1986). The theory is that the costs of those misfortunes can and should be passed through to the consumer of the product whose production occasioned the injury or sickness. *See* Prosser & Keeton, *supra*, at 573. Because it is the trigger to eligibility under workmen's compensation laws, the causal connection between employment and injury or sickness is a frequently-litigated issue in workmen's compensation cases. *See, e.g., Smith v. Lew Williams Cadillac*, 33 Or.App. 21, 575 P.2d 669 (1978).

 If it is to come within the definition of a "workmen's compensation act" for the purposes of section 104, a statute must require, as a precondition to eligibility for benefits, that the injury be incurred in the course of employment. Statutes that do not restrict the payment of benefits to cases of work-related injury or sickness are not considered to be "workmen's compensation acts" under section 104. *See Rutter*, 760 F.2d at 468; *Riley v. United States*, 156 F.Supp. 751, 752 (Ct.Cl.1957); *Haar v. Commissioner*, 78 T.C. 864, 868 (1982), *aff'd*, 709 F.2d 1206 (8th Cir.1983) (per curiam). Conversely, a law that conditions eligibility for benefits on the existence of a work-related injury or sickness may qualify as a "workmen's compensation act" for the purposes of section 104, even though those

benefits are styled as "disability retirement benefits." Rev.Rul. 83–91, 1983–1 C.B. 38. It is within this framework that we must evaluate section 2 of the Anchorage ordinance.

The Anchorage ordinance fits within a broad movement to compensate victims of occupational disease. Society has come to recognize that certain occupations expose workers to increased risk of incurring specific diseases. *See* 1B A. Larson, *supra*, § 41.71. Compensating employees who suffer from these occupational diseases is problematic under traditional workmen's compensation laws because it is often difficult or impossible for the individual worker to prove that his sickness was incurred in the course of his employment. *See, e.g., Queen v. State Accident Insurance Fund Corp.*, 61 Or.App. 702, 658 P.2d 563 (1983); *Olson v. Federal American Partners*, 567 P.2d 710 (Wyo.1977); 1B A. Larson, *supra*, § 41.33 (noting need to distinguish occupational diseases from diseases "which might be as readily contracted in everyday life or other occupations"). Various legislatures have attempted to relieve fire fighters and police officers of the burden of proving occupational causation in individual cases of heart and lung illness, and have enacted presumptions (of varying strengths) that their heart and lung problems arose out of their employment. *See* 1B A. Larson, *supra*, § 41.72, at 7–503.

Presumptions provide a shortcut to recovery by weakening the quantum of proof needed to recover. Instead of having to prove the ultimate fact of causation, the worker may prove certain basic facts from which causation will be presumed. In Take's case, the basic fact of his employment as a fire fighter sufficed under the Anchorage ordinance to show that his heart ailment was caused by his employment.

Presumptions may or may not allocate the benefits available under a workmen's compensation statute to the intended beneficiaries of such a statute, i.e. people with work-related injuries. The allocative success of a presumption depends in large part

on the real correlation between the basic facts needed to satisfy the presumption and the presumed fact of occupational causation. The strength of the presumption also affects its success either by magnifying (if the presumption is irrebuttable) or softening (if it is rebuttable) the incongruities between basic and presumed facts. (For discussion of the allocative effects of presumptions, see *Developments in the Law—Toxic Waste Litigation,* 99 Harv.L. Rev. 1458, 1641–44 (1986).)

Section 2 of the Anchorage ordinance enacts a presumption that is bound to distribute substantial benefits to people whose injuries are not work-related. We need not delve too deeply into the medical realities underlying the presumption to note that heart and lung disease are generally present among the general population, unlike many other diseases for which presumptions are enacted, which generally affect only certain workers. *See, e.g.,* 20 C.F.R. § 410.416(a) (1972) (supplying presumption that black lung disease arises out of employment as coal miner). Section 2 of the Anchorage ordinance does not contain minimum exposure or time-in-job requirements, so that an officer or fire fighter who develops heart or lung problems after a short time in the position, and without actual exposure to the hazards described in the ordinance, is entitled to the presumption that the illness is work-related. Because the presumption is irrebuttable, the incongruities occasioned by the breadth of the presumption are magnified due to the city's inability to show, even in the most extreme cases, that the illness is not work-related. Thus the Commissioner and the Tax Court had ample ground to distinguish this presumption from the rebuttable presumption enacted for the victims of black lung disease. *See* Rev.Rul. 72–400, 1972–2 C.B. 75 (stating that "black lung benefits" are received under statute that qualifies for section 104(a)(1) treatment).

Even though the record discloses that Take's illness might have been work-related, we are not in a position to accept proof on that issue, nor was the Tax Court.

Courts are required instead to examine the statute under which a taxpayer receives benefits to determine whether the law qualifies for section 104 treatment. *See Gallagher,* 75 T.C. at 316. If the statute does not qualify, then whether the injury was in fact work-related is irrelevant. The Second Circuit has so held in *Rutter,* in which the section 104 exemption was denied to a police officer who clearly had sustained an injury in the line of duty because his benefits were not received under a statute "in the nature of a workmen's compensation act." 760 F.2d at 468. Like the Tax Court, we conclude that the combination of a loose correlation between basic and presumed facts, along with the absence of any possibility of rebuttal, takes this particular law, section 2 of the Anchorage ordinance, out of the statutory category of "workmen's compensation acts."

If we were not required to distinguish workmen's compensation laws from other laws, we might be reluctant to inspect the elements of presumptions such as one in the Anchorage ordinance. Efforts to relax strict causation requirements in order to compensate victims of occupational disease are relatively new, and are on the increase. Although these laws are generally intended to compensate only those who suffer from work-related injuries, some of these laws have the ancillary purpose of providing retirement or other benefits as well. *See* 1B A. Larson, *supra,* § 41.72, at 7–503 n. 4 (questioning whether police and fire heart and lung benefits are part of workmen's compensation laws as distinguished from separate programs). Until Congress by statute, or the Commissioner by regulation, gives further guidance in this area, the law should evolve on a case by case basis, and our opinion is so confined.

The decision of the Tax Court is AFFIRMED.