**HARBOR BANCORP & SUBSIDIARIES;
Edward J. Keith; Elena Keith,
Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.**

No. 96–70037.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1997.

Decided June 10, 1997.

As Amended Aug. 6, 1997.

---

Mary Gassmann Reichert, Bryan Cave, St. Louis, Missouri, for petitioners-appellants.

Richard Farber (argued), Gary R. Allen, Edward T. Perelmuter, Tax Division, United States Department of Justice, Washington, D.C., for respondent-appellee.

Before MAGILL,* RYMER, and THOMAS, Circuit Judges.

---

* Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

RYMER, Circuit Judge:

Taxpayers Harbor Bancorp and Edward and Elena Keith appeal from a decision of the Tax Court denying tax-exempt status to interest the taxpayers earned on bonds issued by the Riverside County, California, Housing Authority. The Tax Court determined that (1) the Riverside County bond issues were subject to the Tax Reform Act of 1986 because the bonds were issued after December 31, 1985, and (2) the interest on the bonds is taxable because they are "arbitrage bonds" under the 1986 Act, in that (a) the proceeds were used, without the Housing Authority's permission or knowledge, to make "nonpurpose investments" with a return higher than the interest rate on the bonds, and (b) the Housing Authority did not rebate the excess earnings, or arbitrage, to the U.S. Treasury. The Tax Court had jurisdiction under I.R.C. §§ 6214, 7442, and 7460(b).[1] We have jurisdiction under I.R.C. § 7482, and we affirm.

## I

This is a complicated story involving two separate but substantially identical municipal bond issues of the Riverside County Housing Authority. There are two controlling questions, involving two pivotal events in the life of the bonds.

One question is whether 1985 or 1986 tax laws control. This depends on whether the bonds were issued in an irregular pair of closings on December 31, 1985, or instead were issued February 20, 1986 when actual dollars began to flow within the Housing Authority's financing plan. The second question is whether, given that a financial institution that took part in the bond financing plans misappropriated the bond proceeds and invested them, the Authority was obligated to pay the Treasury the spread between the yield on the bonds and the return on the unexpected investments if it wanted to preserve the tax-exempt status of the interest paid to the bondholders in this case.

## A

The Riverside County Housing Authority is an arm of the County whose governing body is the County's board of supervisors. In 1985, the Authority wanted to finance construction of low- and moderate-income housing in the County with municipal bonds. After some deliberation, the Authority settled on a "conduit financing" plan. Conduit financing differs from the traditional "government financing" structure of municipal bond issues in which a public entity uses the bond proceeds to build public facilities. In conduit financing, the governmental bond issuer channels the funds to a private entity, such as a housing developer, to use for a public purpose. See generally J.R. Eustis, Jr. & D.M. Weiner, *Raising Funds with Tax–Exempt Bonds*, 240 PLI/Tax 141 (1986), *available in* Westlaw.

In late 1985, Riverside County approved bond issues and conduit financing plans for two housing developments, to be known as the Whitewater Garden Apartments and the Ironwood Apartments. One-fifth of the units in each development were to be for low- and moderate-income families. Whitewater was expected to have a total of 460 units; Ironwood was expected to have 312.

The conduit financing was designed to work as follows. The Housing Authority would issue the Whitewater and Ironwood bonds through two Wall Street underwriters—Donaldson, Lufkin & Jenrette Securities (DLJ) and Drexel, Burnham, Lambert, Inc.—with Interfirst Bank of Houston holding the proceeds as trustee for the bondholders. The Authority would lend the bond proceeds—about $18 million for the Whitewater project and about $12 million for Ironwood—to the respective developers, and assign each developer's note to the trustee, Interfirst. Each developer would hold the

1. By order of the Chief Judge, pursuant to I.R.C. § 7460(a) and (b), a single Tax Court judge conducted the trial and issued a report of his findings and recommendation, after which the full Tax Court issued a reviewed decision. *See Smith*

*v. Commissioner*, 926 F.2d 1470, 1473 n. 3 (6th Cir.1991). The full Tax Court adopted the trial judge's findings of fact but not his proposed disposition. The trial judge's report is not part of the record on appeal. I.R.C. § 7460(b).

bond proceeds in an earmarked "developer loan fund" at a predesignated bank.

Next, under the plans, the Whitewater and Ironwood developers would obtain letters of credit by mortgaging the property where each project was to be built. The bank that issued the letter of credit in exchange for the mortgage would then sell that mortgage for cash to a predesignated institution, then use that cash to buy a guaranteed investment contract (GIC) with sufficient returns to pay the interest and principal on the bonds. The bank would pledge the GIC to the trustee, Interfirst, to secure the bonds. The goal was that, in exchange for fees to various financial institutions, each bond issue would be backed by an investment-grade instrument, the GIC, as well as by the developer's note. One downside was that the developers would carry extra debt. The developers were expected to pay off their notes and mortgages with the rental income from the projects.

SBE Development, Inc., which had been active in California's construction industry for more than a decade, was chosen as the primary developer for each project. As the designated "letter of credit provider" for the Whitewater project, the County selected Mercantile Capital Finance Corp. No. 47 (MCFC 47). The letter of credit provider for Ironwood would be Mercantile Capital Finance Corp. No. 30 (MCFC 30). As the "mortgage purchaser" for both Whitewater and Ironwood, the County selected Unified Capital Corp. The two MCFCs were controlled by James J. Keefe, who was also one of three people who controlled Unified Capital. Unified Capital's eventual diversion of the bond proceeds would start the chain of events that has led to this case.

The principals involved in preparing the Whitewater and Ironwood bond issues knew of changes in the tax laws that would apply to municipal bonds issued after December 31, 1985, so they believed it was important to complete the issues by the end of the year. Yet by mid-December, after the County supervisors had approved the bond issues and after certain financing documents had been executed at a pre-closing, both Wall Street firms whom Riverside expected would underwrite the bonds pulled out. An investment banker at DLJ arranged to install Matthews & Wright, Inc., another Wall Street firm, in their place. Matthews & Wright was a well-known underwriter of municipal bonds, and DLJ itself was preparing an initial public offering of Matthews & Wright's stock. However, the County wasn't told of the substitution of Matthews & Wright at this time.

In order to beat the end-of-year tax deadline, DLJ had planned to have another institution "warehouse" the bonds—that is, to buy them before January 1 and hold them until they could be rated by a bond agency and marketed. Matthews & Wright now took over the warehousing arrangements. On December 29, 1985, Matthews & Wright informed its lawyers and counsel for Interfirst that Commercial Bank of the Americas, a corporation headquartered in the Northern Mariana Islands (and not at that time chartered as a bank), would buy the bonds and warehouse them. An Interfirst executive did a limited one-day check on Commercial Bank's bona fides by confirming that it was listed in a directory of international banks. Unknown to Interfirst, the founder, operator, and sole shareholder of Commercial Bank was an executive of Matthews & Wright.

Two days later, on New Year's Eve 1985, the parties held what appeared to be closings of the Whitewater and Ironwood bond issues at Matthews & Wright's New York offices. These closings, which were among dozens done by Matthews & Wright in much the same way on the same day, were casual affairs considering the amounts of money involved. No representative of Riverside County or the Housing Authority attended. The law firm representing Matthews & Wright as underwriter's counsel sent an associate. Interfirst sent an employee who was in New York on other business but who knew little about the bonds or the financing plans and who followed step-by-step directions from her headquarters during the transactions.

At the closings, counsel for Matthews & Wright, apparently acting on behalf of bond counsel for Riverside, handed temporary Whitewater and Ironwood bond certificates to Arthur Abba Goldberg, vice president of

Matthews & Wright.[2] In exchange, Goldberg handed Interfirst's representative drafts for the face value of the bonds. These drafts (the equivalent of checks) had been prepared from starter kits for new accounts at a credit union that Goldberg himself controlled. The accounts on which the drafts were nominally drawn didn't exist. In closings that same day, Matthews & Wright wrote 24 drafts on Goldberg's credit union for a total of some $750 million, or about 15 times the credit union's assets. Interfirst had accepted large checks from underwriters in the past, however, and it had no reason to think the credit union drafts could be dishonored upon demand for payment.

The drafts were never cashed. Upon receiving them, Interfirst's representative by prearrangement endorsed over the drafts "without recourse" to buy two investment contracts from Commercial Bank of the Americas.[3] The general manager of Goldberg's credit union acted as the signatory for Commercial Bank in the sale of the investment agreements, although he later testified that he knew nothing about Commercial Bank, which in fact was a shell with no material assets. (Prior to the closings, Matthews & Wright—which at this point in the deal was the bondholder for whom Interfirst was acting as trustee—had agreed to hold Interfirst harmless for investing the proceeds of the issuances with Commercial Bank.) Yet Interfirst recorded on its books for December 31 its receipt of the drafts and its purchase of investments with Commercial Bank worth over $30 million.

Finally, in a move that came as a surprise to Interfirst, Goldberg directed Commercial Bank's signatory to endorse the same two credit union drafts back to Matthews & Wright to buy the bonds so Commercial Bank could warehouse them. When the dust cleared, Commercial Bank, which hours earlier had had no assets to speak of, owned the

bonds, but no part of the deal had taken place through the banking system. The drafts ended up in a desk drawer at the credit union on which they were drawn.

Riverside's bond counsel didn't learn of the substitution of Matthews & Wright for DLJ and Drexel until February 10. By then, Riverside's lawyers and Housing Authority officials believed that the bond issuances had closed on December 31. At the urging of its bond counsel, Riverside County subsequently passed a resolution ratifying the selection of Matthews & Wright as its underwriter.

February 20, 1986 was the second pivotal day for the Whitewater and Ironwood bonds, as it was the day Unified Capital diverted the proceeds of the pending public bond sales from their intended purposes. On that day, Matthews & Wright used a line of credit from a bank to buy the Whitewater and Ironwood bonds from Commercial Bank of the Americas, using the bonds themselves as collateral for the credit line. Commercial Bank then deposited the proceeds of its sale of the bonds into the "developer loan funds" at Heritage National Bank of Austin, Texas, in accordance with the Whitewater and Ironwood conduit financing plans.

As agreed under the financing plans, the Whitewater and Ironwood development partnerships then mortgaged their properties in exchange for letters of credit from MCFCs 47 and 30, respectively. But under a prior, secret agreement, unknown to the Housing Authority, the developers transferred control of their developer loan funds in the accounts at Heritage National Bank to Unified Capital, expecting that Unified would later disburse the money as needed.

Unified Capital, as it had agreed to do, purchased the Whitewater and Ironwood mortgages from MCFCs 47 and 30—except that Unified used the developer loan funds in the Heritage accounts instead of its own

---

**2.** The parties were using temporary, unsigned certificates as evidence of the Whitewater and Ironwood obligations prior to getting the bonds into marketable form. The Commissioner has not argued that the use of the temporary certificates affected the legitimacy of the New Year's Eve closings. *Cf.* I.R.C. § 150(a)(1) ("The term 'bond' includes any obligation.").

**3.** By endorsing the credit union drafts to Commercial Bank without recourse, Interfirst insulated *itself* from liability if the drafts were dishonored; Interfirst was not releasing Matthews & Wright, the original maker, from its liability to Interfirst. *See* U.C.C. § 3–415(b) (defining endorsement without recourse).

money. MCFCs 47 and 30 then used the purchase money from Unified (i.e., what remained of the bond proceeds after subtracting the various institutions' fees) to buy two GICs. As planned, the MCFCs pledged the GICs as security for repayment of the principal and interest on the bonds.

The income streams from the GICs exactly equaled the debt service needed to pay the bondholders; the Whitewater and Ironwood bonds were secure investments for the public. The problem for Riverside was that Unified had taken the developer loan funds while the money zipped around on February 20, and had ultimately diverted the proceeds, via MCFCs 47 and 30, into the GICs. As a result, the Whitewater project was never built. The Ironwood apartments were completed with funds borrowed elsewhere, but SBE Development went insolvent in the process. And the bondholders turned out to be loaning money for a purpose other than low- and moderate-income housing.

### B

Harbor Bancorp and the Keiths bought Whitewater and Ironwood bonds in July 1986 and treated the interest as exempt from their gross taxable income on their subsequent returns.

On February 21, 1991, the Commissioner notified the Housing Authority that pursuant to I.R.C. § 148(f), the IRS would consider the Whitewater and Ironwood bonds arbitrage bonds, and would treat the interest on them as taxable, unless the Authority timely paid the federal government a total of about $3.8 million that had been earned in excess of the yield on the bonds by investing the bond proceeds in the GICs. The Authority did not pay, and the Commissioner began treating the interest on the Riverside bonds as taxable.

In March 1993, Harbor and the Keiths filed petitions in the Tax Court challenging the Commissioner's assessments of tax on the interest they earned on the Riverside bonds. The Harbor and Keith dockets were consolidated and tried as a test case.

In October 1995, the full Tax Court issued a reviewed decision denying the petitions.

*Harbor Bancorp & Subsidiaries v. Commissioner*, 105 T.C. 260, 1995 WL 605411 (1995). The court ruled that the issue date of the bonds was February 20, 1986, so the bonds were subject to the Tax Reform Act of 1986, and that the bonds were taxable arbitrage bonds under § 148(f) because the proceeds were used for nonpurpose investments within the meaning of that section, although the court found that the Housing Authority did not intend for that to happen. The court did not reach the Commissioner's alternative arguments that the interest on the Riverside bonds is also taxable under § 103(b)(1), -(c)(2), and -(k).

### II

While the Tax Court's determination that the New Year's Eve 1985 closings were shams is a finding of fact we review for clear error, *see Bail Bonds By Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1548 (9th Cir.1987), we review the legal standards the court applied in reaching its conclusions de novo. *Id.; see Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir.1995). At the same time, "the Commissioner has latitude in the interpretation of the Internal Revenue Code ... and ... the Tax Court's opinions bearing on the Internal Revenue Code are entitled to respect because of its special expertise in the field." *Take v. Commissioner*, 804 F.2d 553, 556 (9th Cir.1986) (citing *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)). We owe no deference to the Commissioner or to the Tax Court on issues of state law. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (requiring deference to "[a]n agency's construction of a statute it is charged with enforcing"). We defer to the Commissioner's construction of tax regulations unless her position is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (quotation marks and citation omitted).

### III

Harbor Bancorp and the Keiths (Harbor) argue that the Tax Court shouldn't have

applied the arbitrage provisions of I.R.C. § 148(f) to the Whitewater and Ironwood bonds in the first place because § 148(f) applies to bonds issued on or after January 1, 1986, *see* Tax Reform Act of 1986, Pub.L. No. 99–514, § 1314(d), 100 Stat. 2085, 2664 (1986),[4] and, Harbor argues, the court erred in finding that the Riverside bonds were issued February 20, 1986 rather than in the New Year's Eve 1985 closings.

The IRS regulations that were in effect in 1985 defined the "date of issue" of a state or municipal bond as

> the date on which there is a physical delivery of the evidences of indebtedness in exchange for the amount of the issue price. For example, obligations are issued when the issuer physically exchanges the obligations for the underwriter's (or other purchaser's) check.

Treas. Reg. § 1.103–13(b)(6) (added 1979, superseded 1994). The Commissioner argues, as she did in the Tax Court, that we should apply a similar regulation proposed in 1992 and promulgated in 1994, which currently defines the issue date as

> the date on which the purchaser receives the purchase price in exchange for that bond. In no event is the issue date earlier than the first day on which interest begins to accrue on the bond or bonds for Federal income tax purposes.

Treas. Reg. § 1.150–1(c)(2) (1996).

The Tax Court applied the former regulation but indicated that its result would be the same under the latter. 105 T.C. at 275 & n. 8. Because the record indicates the bonds began to generate interest December 1, 1985—and furthermore, the Commissioner has not argued that the sentence in § 1.150–1(c)(2) regarding the date that interest begins to accrue is material—we agree with the Tax Court that for our purposes there is no difference between the two regulations. Under either version, the question is when the Authority received the "purchase price" or "issue price" from the underwriter.

The Tax Court concluded that the New Year's Eve 1985 transactions were shams that didn't suffice to issue the bonds under the regulations. It reasoned:

> Courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes when the objective realities are to the contrary. *Commissioner v. Tower*, 327 U.S. 280, 291 [66 S.Ct. 532, 537–38, 90 L.Ed. 670] (1946). Here, the hastily drawn up papers used at the putative closings ... utterly fail to reflect objective reality. The alleged payment for the bonds took the form of share drafts from starter kits, drawn on nonexistent accounts at a Jersey City credit union. The agent of the trustee promptly endorsed these items, without recourse to the trustee, to the order of an undercapitalized institution located in Saipan that had recently lost its banking license [Commercial Bank]. In exchange, the trustee took the Saipan institution's investment agreements. If, on December 31, 1985[ ]—the alleged "date of issue"—the trustee had sought either to cash the share drafts or to collect upon its investment agreements, it would have been unsuccessful.... These items fell embarrassingly short of representing actual payment for the bonds within the meaning of the Commissioner's regulations.

105 T.C. at 276. The court found that the bonds were issued "February 20, 1986, when actual funds were transferred" out of Matthews & Wright's line of credit, to Commercial Bank, and eventually into the GICs. *Id.*

Harbor thinks this is wrong for a number of reasons. It argues that a check constitutes valid consideration for a bond purchase, and that to hold otherwise, as the Tax Court did, suggests that a bond purchaser may not rely on what the regulation says but must instead pay in cash or gold bullion to effectuate an issuance of municipal bonds. Harbor points out that there were no limitations on the faces of the drafts, nor did the trustee have any reason to believe that the

---

4. Section 1314(d) of the 1986 Act provides:
   Except as otherwise provided in this subsection, in the case of a bond issued after December 31, 1985, section 103 of the 1954 Code shall be treated as including the requirements of section 148(f) of the 1986 Code in order for section 103(a) of the 1954 Code to apply.
   100 Stat. at 2664.

drafts would have been dishonored had they been presented for payment on that date. As the parties therefore became unconditionally liable to each other at that time, Harbor submits, the transaction was closed for tax purposes. Harbor also maintains that the December 31, 1985 closing wasn't a sham because issuance of the bonds and the bond financing documents had been thoroughly reviewed and agreed to prior to December 31. On that date, in its view, the conduit borrowers became obligated to make payments under the Developer Note and the Loan Agreement; the Housing Authority became obligated to pay principal and interest on the bonds to the bondholders; Matthews & Wright became obligated to the Housing Authority on $30 million in checks (albeit that when delivered, were drawn on insufficient funds); and the Housing Authority's intentions were bona fide. Further, Harbor argues, the New Year's Eve closings were not mere tax avoidance devices, but had economic substance beyond creating the tax benefit, in that, if things had gone right, Riverside and the Housing Authority would have gotten benefits in the form of more affordable housing for residents of the County, real estate taxes from the projects, tourism, and so forth. Finally, Harbor says that when Matthews & Wright paid for the bonds, it acquired the market risk between December 31, 1985 and whenever the bonds were remarketed to the public. The shift in economic risk and relationships among the parties, Harbor argues, shows that the events on New Year's Eve 1985 were not shams. Harbor relies primarily on cases upholding sale-leaseback arrangements against claims by the Commissioner that they were shams. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 580, 584, 98 S.Ct. 1291, 1301–02, 1303–04, 55 L.Ed.2d 550 (1978); *Sacks,* 69 F.3d at 988–92; *see also Pritchett v. Commissioner,* 827 F.2d 644, 647 (9th Cir.1987) (holding taxpayer's debt wasn't sham where taxpayer was personally liable but debt was to be repaid from returns on investing the principal).

The Commissioner argues that the Tax Court got it right because the December 31 events were tax-motivated and lacking in economic substance. The heart of her position is that worthless checks cannot be given effect for federal tax purposes. As she reads the regulations, the requirement that the bonds be exchanged for the amount of the "issue price" presupposes a check that is backed by sufficient funds if presented for immediate payment. The Commissioner also relies on so-called "circular check scheme" cases where we have held that taxpayers may not receive tax benefits based on checking arrangements that lack economic substance. *See Erhard v. Commissioner,* 46 F.3d 1470, 1477 (9th Cir.1995) (upholding Tax Court's finding that debt created when taxpayer-controlled corporations loaned money to each other in laundering "system" was sham); *Goldberg v. United States,* 789 F.2d 1341, 1343 (9th Cir.1986) (same result involving the same tax advisor); *Thompson v. Commissioner,* 66 T.C. 1024, 1976 WL 3733 (1976) (same), *aff'd,* 631 F.2d 642 (9th Cir. 1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981); *see also American Principals Leasing Corp. v. United States,* 904 F.2d 477, 483 (9th Cir.1990) (upholding disallowance of three taxpayers' depreciation deductions for property leased to each other in a circle because their investments were not "at risk" under I.R.C. § 465). The Commissioner also suggests that the December 31 events were entirely tax-motivated since the bonds were not going to be marketed to the public until 1986 anyway. Finally, she contends that it doesn't matter whether Interfirst or Riverside was aware that the drafts weren't backed by funds on New Year's Eve 1985 because in any event Matthews & Wright did not acquire ownership of the bonds until it actually paid Commercial Bank for them on February 20, 1986.

It is axiomatic that tax law follows substance and not form. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945); *Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935). Resolving the parties' substance-versus-form arguments in this case is complicated by the fact that the authorities they rely on, and the theories they advance, have mainly to do with deciding the tax consequences of a transaction for the persons involved in it.

Obviously, the taxpayers in this case had nothing to do with the events of December 31, 1985. Furthermore, the question in this case that requires us to consider the substance of the New Year's Eve transactions is quite different from the questions in the cases upon which the parties rely. Here, we have only to decide the relatively straightforward question what the "issue date" was—not whether (for example) the transactions that took place on December 31, 1985 caused anyone to receive income, or entitled anyone to a deduction, as of that date for federal tax purposes. For these reasons, we don't believe the sale-leaseback or check-circle cases are particularly helpful, given that their focus is on whether taxpayers succeeded in deferring income or generating deductions.

Instead, we must look at the New Year's Eve bond sales as a whole to determine whether the Tax Court clearly erred in finding that they lacked substance. "The high stakes in tax cases, and the high intelligence of tax lawyers, make[ ] it impossible to have a simple checklist or rigid formula for determining whether a transaction is a sham." *Sacks,* 69 F.3d at 988. We do not disagree with Harbor's point that the fact that the parties wanted the issue date to be in 1985 in order to beat the effective date of more restrictive arbitrage bond rules is " 'legally neutral.' " *Id.* at 986 (quoting *Chisholm v. Commissioner,* 79 F.2d 14, 15 (2d Cir.1935)). Nor do we question the benefit that Riverside perceived in deciding to issue the bonds in the first place. However, as we see it, these arguments sidestep the question whether the bonds were exchanged for the "amount of the issue price" on December 31, 1985 or February 20, 1986.

■ Despite the force of the taxpayers' arguments, we cannot say that the Tax Court clearly erred in finding that the bonds weren't really issued on New Year's Eve. It is true, as Harbor contends, that the bonds were handed over to Matthews & Wright, and that by signing drafts drawn on the credit union, Matthews & Wright assumed an unconditional obligation to pay the face amounts. *See* U.C.C. § 3–414 (draft is unconditional promise to pay even if dishonored). But to the extent the drafts boiled down to promises to pay when the paperwork for remarketing was completed, there was no security behind them.

While as commercial paper accepted in due course, *see* U.C.C. § 3–302, the drafts did not necessarily lack any value, still they were no good on December 31. As the Tax Court found, the drafts were drawn on nonexistent accounts, and there is no dispute that Matthews & Wright lacked funds, at the credit union or elsewhere, to pay the face amounts on that date. Indeed, although it was unknown to Interfirst or Riverside, there is evidence that Matthews & Wright knew it couldn't come up with $30 million for the bonds on New Year's Eve and had no intention of doing so. In any event, after receiving the drafts, Interfirst endorsed them—making sure it had no liability for doing so—to an offshore institution that had essentially no assets but which provided "investment agreements" for the full amount of the "issue price" in return. In short, no real money was changing hands.

Although it is tempting to let Interfirst's and Riverside's ignorance—and certainly the taxpayers' innocence—obscure the reality of the bond issuances, we cannot ignore the fact that all parties to the New Year's Eve transactions knew nothing was going to happen until the bonds had been rated, they were sprung from the warehouse, and actual funds were transferred into the black box. We don't pretend to know or comment on all the possible ways that an end-of-the-year deal could have been done, and bonds could have been "issued" on December 31, without raising questions about whether anything really happened. Yet it is obvious that avenues were available for Interfirst and Riverside to be assured that the "checks" given for the bonds (and in turn, the investment agreements given for the "checks") were worth $30 million. As the record shows—and as prior iterations of this deal had contemplated—funds could have been wire transferred, or cashier's or certified checks could have been used. Instead, the parties used drafts from starter kits, which the credit union manager himself testified had no value. The Tax Court was entitled to find that the December 31 transactions weren't real, and that the bonds were actually issued February 20, 1986.

## IV

Harbor argues that even if, as we have concluded, the Riverside bonds are subject to the Tax Reform Act of 1986, they are not "arbitrage bonds" under I.R.C. § 148(f), in that the Housing Authority itself did not make "nonpurpose investments" within the meaning of that section, nor did it benefit from such investments, since the money invested in the GICs was in essence stolen from the developer loan accounts. Thus, Harbor argues, the Authority wasn't obligated to pay a rebate to the Treasury in order to maintain the bonds' tax-free status.

Under § 103, the interest on state and municipal bonds is generally excluded from taxable income. Section 103(b)(2) makes an exception if the bond is an "arbitrage bond" within the meaning of § 148. Section 148(a) and (f) define an arbitrage bond as follows:

(a) Arbitrage bond defined.—For purposes of section 103, the term "arbitrage bond" means any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used directly or indirectly—

(1) to acquire higher yielding investments, or

(2) to replace funds which were used directly or indirectly to acquire higher yielding investments.

For purposes of this subsection, a bond shall be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue of which such bond is a part in a manner described in paragraph (1) or (2).

. . . .

(f) Required rebate to the United States.—

(1) In general.—A bond which is part of an issue shall be treated as an arbitrage bond if the requirements of para-

graphs (2) and (3) are not met with respect to such issue. . . .

(2) Rebate to United States.—An issue shall be treated as meeting the requirements of this paragraph only if an amount equal to the sum of—

(A) the excess of—

(i) the amount earned on all nonpurpose investments (other than investments attributable to an excess described in this subparagraph), over

(ii) the amount which would have been earned if such nonpurpose investments were invested at a rate equal to the yield on the issue, plus

(B) any income attributable to the excess described in subparagraph (A), is paid to the United States by the issuer in accordance with the requirements of paragraph (3).

(3) [procedures for rebate]

§ 148(a), (f). A "nonpurpose investment" is defined as "any investment property" that is "acquired with the gross [bond issue] proceeds" but which is not purchased "to carry out the governmental purpose of the issue." *Id.* § 148(f)(6)(A).

The Tax Court found that Unified Capital caused nonpurpose investments to be made when it appropriated the bond proceeds and paid them to the MCFCs, which caused the proceeds to get tied up in the GICs. Harbor doesn't dispute that the GICs were bought for a nongovernmental purpose or that they earned a higher return than the bonds; it concedes that the GICs would be nonpurpose investments if the Housing Authority itself had bought them with the bond proceeds.[5] Instead, it argues that the GICs were not nonpurpose investments, and no rebate was owed by the Authority, because the definition of nonpurpose investments in § 148(f) doesn't cover investments that the issuer doesn't itself make or benefit from.

---

**5.** The Tax Court noted that

[l]ogic indicates that the amount earned on the [GICs] was substantially in excess of the amount which would have been earned if the amounts invested in the GIC's had been invested at a rate equal to the yield on the bond issues. The amount available to buy the GIC's—the bond proceeds—had been dimin-

ished by substantial fee payments and by the purchase of land. . . . Because an amount that was substantially less than the bond proceeds was invested in the GIC's, and [yet] the GIC's nevertheless generated enough revenue to pay the bonds' debt service requirements, it follows that the GIC's paid interest at higher rates than the yield on the bonds.
105 T.C. at 279.

The Commissioner argues that under the "plain meaning" of § 148(f), which defines a nonpurpose investment as "any investment property" purchased with the gross proceeds for a nongovernmental purpose, the rebate obligation is triggered if anyone makes "any" such investment with the bond proceeds, with or without the issuer's consent. The Tax Court agreed. It ruled that

> [w]hile the Housing Authority did not directly purchase the GIC's and, presumably, did not intend that the bond proceeds be used to purchase the GIC's, the GIC's were in fact purchased with the proceeds of the bonds and committed to provide funds for the repayment of principal and interest on the bonds rather than for the governmental purpose of constructing multifamily housing. Thus, the GIC's fall within the statutory definition of nonpurpose investments.

105 T.C. at 278. The court added: "[T]he literal provisions of section 148(f)(1) and (2) make no reference to the issuer's intent. Rather, the language of section 148(f)(2) is computational in nature and unambiguous." *Id.* at 283.

Unlike the Tax Court, we do not believe that the language of § 148(f) is plain or unambiguous as applied in this case. Nonetheless, we believe the Commissioner and the Tax Court could properly interpret the Code as they have.

## A

■ We begin as always with the words of the statute. *United States ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1213 (9th Cir. 1996). Harbor argues that the use of the term "rebate" in § 148(f) implies that the issuer must be in possession of the earnings (as the Authority was not). While the word "rebate" does suggest the return of money received, we note that "reimburse" and "render" are synonyms for "rebate," *The New Roget's Thesaurus* 339 (N. Lewis ed., rev. ed.1978), which suggests that a rebater needn't always possess the rebated funds in the first place. Thus, the presence of the term "rebate" doesn't compel Harbor's conclusion. Furthermore, as the Commissioner argues, there is a sense in which Riverside at least constructively received the return on the GICs, since the income was used to pay Riverside's bond obligations; and to that extent, Riverside would be "rebating" a benefit to the Treasury. Harbor also submits that the use of the word "any" in defining nonpurpose investments as "any investment property" meeting certain conditions is ambiguous, and that it should be read narrowly to cover only investments made by the issuer. But as we shall discuss, the Commissioner's reading is grounded in the statute, as § 148(f)(6)(A)(i) broadly defines the "nonpurpose investments" on which a rebate is required to include "any investment property which is acquired with the gross proceeds," without limitation to investments made by the issuer. Furthermore, we are mindful that what is ultimately at stake is the exclusion of the interest on the bonds from Harbor's gross income under § 103, which, like other exclusions, must be "construed narrowly in favor of taxation." *Hawkins v. United States,* 30 F.3d 1077, 1080 & n. 3 (9th Cir.1994).

On the other hand, we do not accept the Commissioner's view that the "plain meaning" of § 148(f) requires that the rebate obligation be triggered if anyone makes any nonpurpose investment with the bond proceeds, even without the issuer's consent. Rather, "employing traditional tools of statutory construction," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9, we believe that § 148(f) must be read alongside § 148(a) ("Arbitrage bond defined"). Subsection (a) defines an arbitrage bond with reference to the *issuer's* actions and the *issuer's* expectations. Read together with the primary definition in § 148(a), then, the key phrase "the amount earned on all nonpurpose investments" in § 148(f) might likewise refer only to investments made by the issuer. Under this reading, § 148 would mean that a bond is an arbitrage bond if the issuer intentionally makes a higher yielding investment (subsection (a)), or if the issuer accidentally makes a nonpurpose investment and doesn't rebate the excess earnings to the Treasury (subsection (f)).

We believe this alternative construction of § 148 is at least as plausible as the Commissioner's. The Tax Court declined to "superimpose an intent requirement" onto § 148(f), 105 T.C. at 284, but that isn't what's at stake. Rather, the question is whether an invest-

ment, be it intentional or unintentional, must be made by *the bond issuer itself* in order to qualify as a nonpurpose investment under § 148(f). Unlike the Tax Court, we are not persuaded that because Congress drafted the rebate provision of § 148(f) in the passive voice ("the amount earned"), Congress necessarily intended subsection (f) to be triggered by investments made by parties other than the issuer, when subsection (a) is not so triggered. The construction of § 148(f) adopted by the Commissioner and the Tax Court may be permissible, but it isn't compelled by the text itself.

**B**

Both sides also argue from legislative history, but it doesn't help clarify whether Congress intended nonpurpose investments under § 148(f) to include ones that the bond issuer neither makes nor benefits from. Harbor cites congressional committee publications that describe the amounts that an issuer must rebate under § 148(f) by using passive phrases—"profits earned," "amounts earned," "actually earned"—just like those in § 148(f) itself. *See* Staff of Joint Committee on Taxation, 100th Cong., 1st Sess., General Explanation of the Tax Reform Act of 1986, at 1206 (Comm. Print 1987); Staff of Joint Committee on Taxation, 98th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 949 (Comm. Print 1984). Like the Code, these publications (which in any event are not legislative history) do not say *who* must do the earning in order to trigger § 148(f). The Commissioner cites general statements from the Senate Report on the 1986 Act which are also unilluminating.

**C**

Harbor bases its central argument on the language of the accounting regulations implementing § 148(f). Harbor maintains that (1) because Treas. Reg. § 1.103–13(f) says that in calculating a rebate due under § 148(f), a bond issuer "shall allocate the cost of *its acquired obligations*" (emphasis added) to the unspent proceeds of the issue, and (2) because "acquired obligations" includes "nonpurpose investments," Treas. Reg. § 1.103–13(b)(4)(iv)(B), therefore (3) an issuer is responsible only for rebates attributable to

"its" nonpurpose investments. Harbor argues that the word "its" in the regulations shows that § 148(f) isn't triggered by investments—like the GICs in this case—that the issuer doesn't own.

We disagree. First, the cited accounting regulations are just that, accounting rules: they do not purport to cabin or define the underlying tax obligations of § 148(f). Therefore, the Code controls. Furthermore, as the Commissioner argues, her regulations' use of the word "its" can be squared with her broad reading of § 148(f) if one assumes that the word "its" "reflects the fact that the proceeds of 'its' [the issuer's] bonds are used to acquire the obligation" with or without the issuer's consent. The regulations add nothing to the Code.

**D**

Harbor also relies on *State of Washington v. Commissioner*, 692 F.2d 128 (D.C.Cir. 1982), which held that an issuer did not earn arbitrage unless its net investment returns exceeded the administrative costs of the bond issue, such as banking and legal fees. Although Congress overruled this holding of *State of Washington* in the 1986 tax reform, I.R.C. § 148(h), Harbor argues that the 1986 Act effected only a "mathematical change" in calculating arbitrage, and that *State of Washington* still stands for the proposition that arbitrage occurs only when the issuer itself earns profits by investing the bond proceeds.

*State of Washington* interpreted a Code section different from today's § 148(f). At the time, I.R.C. § 103(c)(2) defined an arbitrage bond as one whose proceeds were reasonably expected to be used to buy securities with "a yield ... which is materially higher ... than the yield on" the bond issue itself. *State of Washington* turned on the definition of "yield." The state argued that the IRS regulations were inconsistent with § 103(c)(2), because under the regulations an issuer couldn't deduct its administrative costs when calculating the "yield" on its bonds. The Tax Court and the District of Columbia Circuit agreed. The appeals court said that in § 103(c)(2), Congress was trying to measure the "actual return" to the issuer on its

investments, and that administrative expenses were part of the "cost of money" to be used in figuring that actual return. *State of Washington,* 692 F.2d at 131–33.

Harbor relies on a passage from the D.C. Circuit opinion in which the court rejected the Commissioner's argument that the "yield" on Washington's bond issue was the interest rate that the bond holding public received. The court held instead that "yield" must be calculated using the dollars paid out and received by the issuer.

> Yield can be consistently determined only by using the purchase prices in the transactions to which the State was a party— the purchase price paid to the State for its bonds [by the underwriter] and the purchase price paid by the State for [its own investment]. It is the State that borrows money, and it is the State that [invests the proceeds]; *only the State can earn arbitrage profits,* and only the State can eliminate those profits by restricting the yield of its investment.

*Id.* at 131–32 (emphasis added).

Harbor suggests that the underscored phrase indicates that "arbitrage" includes only investments made by the issuer. However, read in context, the D.C. Circuit was saying only that under § 103(c)(2), the *bondholders* couldn't earn arbitrage profits, and so the yield the *bondholders* received wasn't relevant. The court did not hold that no one but the issuer could make arbitrage profits. And even if it had, *State of Washington* wouldn't influence our reading of § 148(f), since § 148(f) defines arbitrage profits not in terms of the "yield" the issuer "expects" to earn on securities, but as "the amount earned on all nonpurpose investments" made with the proceeds, which could easily be a broader category.

### E

▮ Although we are left with phrases ("the amount earned on all nonpurpose investments" and "any investment property acquired with the gross proceeds") in § 148(f) that are ambiguous, we conclude that the Commissioner and the Tax Court could treat the bonds as arbitrage bonds. By its terms,

the rebate obligation under § 148(f) is triggered when amounts are earned on nonpurpose investments over and above the amount which otherwise would have been earned. Whereas § 148(a) hinges its definition of an arbitrage bond on whether the "issuer" intentionally uses proceeds to acquire higher yielding investments, § 148(f) does not limit its definition of a bond on which a rebate is required according to whether the issuer makes the investment, or receives the earnings, directly. This affords the Commissioner and the Tax Court "ample ground" for their interpretation. *Take,* 804 F.2d at 558.

Harbor argues that the Commissioner's position is overly harsh, and it predicts dire results if governmental bond issuers are required to account for unauthorized investments made with the proceeds of their issues in order to preserve the bonds' tax-free status. However, Harbor doesn't point to compelling evidence, in either the language of § 148 or its history, that this result would violate congressional intent. And the Commissioner offers her own plausible policy argument that her expansive reading of § 148(f) will encourage bond issuers to maintain tight control over the proceeds, and will protect federal taxpayers from having to subsidize unapproved, nongovernmental uses of tax-free state and municipal obligations. As the Commissioner's definition of nonpurpose investments that trigger § 148(f) is a persuasive construction of a complex provision of the Tax Code, we uphold it.

To sum up, because the Whitewater and Ironwood bonds were issued in February 1986 and are arbitrage bonds under § 148(f), the interest on them is taxable, and the Tax Court correctly denied the Harbor Bancorp and Keith petitions.

AFFIRMED.