

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-1998

# ACM Partnership v. Commissioner IRS (Part I)

Precedential or Non-Precedential:

Docket 97-7484,97-7527

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"ACM Partnership v. Commissioner IRS (Part I)" (1998). *1998 Decisions*. Paper 242.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/242

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-7484 and 97-7527

ACM PARTNERSHIP,
SOUTHAMPTON-HAMILTON COMPANY,
TAX MATTERS PARTNER,

      Appellant in No. 97-7484

v.

COMMISSIONER OF INTERNAL REVENUE

ACM PARTNERSHIP,
SOUTHAMPTON-HAMILTON COMPANY,
TAX MATTERS PARTNER,

v.

COMMISSIONER OF INTERNAL REVENUE

      Appellant in No. 97-7527

On Appeal from the United States Tax Court
(Tax Court No. 10472-93)

Argued June 23, 1998

BEFORE: GREENBERG, ALITO, and McKEE,
Circuit Judges

(Filed October 13, 1998)

      Albert H. Turkus (argued)
      Fred T. Goldberg, Jr.
      Pamela F. Olson
      Skadden, Arps, Slate
      Meagher & Flom, LLP
      1440 New York Avenue, N.W.
      Washington, D.C. 20005

      William L. Goldman
      Christopher Kliefoth
      McDermott, Will & Emery
      600 Thirteenth Street, N.W.
      Washington, D.C. 20005

      Attorneys for Appellant

and Cross Appellee ACM
Partnership, Southampton–Hamilton
Company, Tax Matters Partner

Loretta C. Argrett
Assistant Attorney General
Richard Farber
Edward T. Perelmuter (argued)
Tax Division
Department of Justice
Post Office Box 502
Washington, D.C. 20044

Attorneys for Appellee
and Cross Appellant
Commissioner of Internal Revenue

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Appellant ACM Partnership ("ACM"), through its tax
matters partner Southampton–Hamilton Company
("Southampton"), appeals from a decision of the United
States Tax Court dated June 12, 1997. The Tax Court's
jurisdiction rested on I.R.C. SS 7442, 6213 and 6226 based

2

on appellant's timely filing of a petition seeking
redetermination of a deficiency and review of a Final
Partnership Administrative Adjustment. Appellate
jurisdiction rests on I.R.C. S 7482(a)(1). Venue is proper
pursuant to I.R.C. S 7482(b)(1)(A) as Southampton
maintained its principal place of business within this
circuit at the time it filed its petition. For the reasons that
follow, we will affirm in part, reverse in part, dismiss the
Commissioner of Internal Revenue's cross appeal, and
remand for further proceedings.

II. FACTUAL AND PROCEDURAL HISTORY

This appeal concerns the tax consequences of a series of
transactions executed between November 1989 and
December 1991 by appellant ACM, a partnership formed on
October 27, 1989, with its principal place of business in
Curacao, Netherlands Antilles. Each of ACM's three
partners was created as a subsidiary of a larger entity
several days before ACM's formation. Southampton was
incorporated under Delaware law on October 24, 1989, as

a wholly-owned subsidiary of Colgate-Palmolive Company ("Colgate"), an international consumer products company. Kannex Corporation N.V. ("Kannex") was incorporated under Netherlands Antilles law on October 25, 1989, as an entity controlled by Algemene Bank Nederland N.V. ("ABN"), a major Dutch bank. ACM's third partner, Merrill Lynch MLCS, Inc. ("MLCS"), was incorporated under Delaware law on October 27, 1989, as a wholly owned subsidiary of Merrill Lynch Capital Services, an affiliate of the financial services holding company Merrill Lynch & Co., Inc. ("Merrill Lynch"). See ACM Partnership v. Commissioner, 73 T.C.M. (CCH) 2189, 2190, 2197 (1997); app. at 81-84, 89-91.

A. The Proposed Partnership

The concept behind the ACM partnership originated in a proposal which Merrill Lynch presented to Colgate in May 1989. During the previous year, Colgate had reported $104,743,250 in long-term capital gains which were attributable in significant part to the sale of its wholly owned subsidiary The Kendall Company ("Kendall"). See

3

app. at 74-75. Colgate had considered and rejected several proposals to reduce the tax liability arising from those 1988 capital gains, see app. at 664, when Merrill Lynch representative Macauley Taylor approached Colgate's Assistant Treasurer Hans Pohlschroeder in May 1989 and proposed an investment partnership that would generate capital losses which Colgate could use to offset some of its 1988 capital gains. App. at 674-76, 784, 965.1

Pohlschroeder related the plan to Colgate's Vice President of Taxation Steven Belasco, who expressed reservations because the plan entailed substantial costs, might not be recognized for tax purposes, and did not seem to serve Colgate's non-tax business purposes, and thus might not be well-received by Colgate's legal, financial, and accounting departments who would be required to participate in the plan. See 73 T.C.M. at 2191; app. at 1234-36. Colgate consulted a law firm for advice on the proposed transaction, which the law firm summarized as follows:

> A (a foreign entity), B, and C form the ABC Partnership (ABC) on June 30, 1989 with respective cash contributions of $75, $24 and $1. Immediately thereafter, ABC invests $100 in short-term securities which it sells on December 30, 1989, to an unrelated party. The fair market value and face amount of the short-term securities at the time of the sale is still

> $100. In consideration for the sale, ABC receives $70
> cash and an installment note that provides for six
> semiannual payments . . . Each payment equals the
> sum of a notional principal amount multiplied by the
> London Interbank Offering Rate (LIBOR) at the start of
> the semiannual period.2 ABC uses the $70 cash and
> the first payment on the installment note to liquidate
> A's interest in ABC and uses the subsequent interest
> payments to purchase long-term securities.

_____

1. The proposal was premised on I.R.C. S 1212(a), which permits a
taxpayer to carry back a capital loss to offset capital gains recognized
within the preceding three years.

2. The LIBOR [London Interbank Offering Rate] is the primary fixed
income index reference rate used in [Europeanfinancial] markets.
(Footnote is by Tax Court.)

4

73 T.C.M. at 2191.

The law firm advised that the sale of the short-term
securities would be reported as a contingent installment
sale under the installment method which governs
"dispositions[s] of property where at least 1 payment is to
be received after the close of the taxable year in which the
disposition occurs," I.R.C. S 453, and the ratable basis
recovery rule which provides that,

> [w]hen a stated maximum selling price cannot be
> determined as of the close of the taxable year in which
> the sale or other disposition occurs, but the maximum
> period over which payments may be received under the
> contingent sale price agreement is fixed, the taxpayer's
> basis (inclusive of selling expenses) shall be allocated
> to the taxable years in which payment may be received
> under the agreement in equal annual increments.

Temp. Treas. Reg. S 15a.453-1(c)(3)(i).3 Thus, the law firm
advised, ABC would recover $25 of its basis in each of the
4 taxable years from 1989 through 1992, and ABC would
recognize gain to the extent that the payments received in
any year exceeded the $25 or loss to the extent that the
payments fell below the $25, but only if the loss were
carried over to a year with sufficient reported gains against
which to offset that loss. See 73 T.C.M. at 2191.

On July 18, Pohlschroeder and Taylor, who had
presented Merrill Lynch's proposal to Pohlschroeder's
colleagues in Colgate's treasury department, discussed

Colgate's concerns about the proposed partnership
transaction, including its costs and its potential to serve
Colgate's business purposes. Pohlschroeder's handwritten
notes of the conversation read as follows:

> . . .
> Based on bus. purpose
> Economic profit
> Is this partnership profitable?

_____

3. All citations to the Internal Revenue Code and Treasury regulations
with respect to both this case and the cases we cite are to the versions
in effect at the time of the relevant transactions.

5

> Every single step to be substantiated
> invest in your own debt
> Consolidation of effective control but not majority
> ownership.

App. at 634, 791.

Colgate was interested in the concept of using the
proposed partnership to invest in its own debt because of
recent developments which had weighted Colgate's debt
portfolio toward fixed-rate long-term debt, leaving Colgate
vulnerable to a decline in interest rates.4 Moreover,
persistent rumors that Colgate was a likely target for a
hostile takeover or leveraged buyout had decreased the
value of Colgate's debt issues due to the risk that Colgate's
credit rating would be downgraded if Colgate became more
highly leveraged. Because of these factors, Colgate
perceived an opportunity to rebalance its debt profile, thus
decreasing its exposure to falling interest rates, by
acquiring its long-term debt issues at their presently
discounted prices. See app. at 666-68, 880-82, 2762-63,
2765, 2769-70; 73 T.C.M. at 2192.

Colgate and Merrill Lynch discussed the possibility of
using the proposed partnership to achieve these objectives.
The acquisition of its own debt issues would decrease
Colgate's exposure to falling interest rates because by
acquiring those debt issues as an asset, Colgate effectively
would reap the benefits of receiving the above-market
interest payments due on those issues, thus hedging
against the burdens associated with owing those payments.
See 73 T.C.M. at 2193. Acquiring the debt through the
partnership instead of directly would keep the acquisitions
off Colgate's books, thus permitting Colgate to carry out its

_____

4. The elevated proportion of long-term debt in Colgate's debt structure arose in part from Colgate's use of the proceeds from the Kendall sale to retire significant amounts of short-term debt and its issuance of long-term debt to finance an employee retirement plan. See 73 T.C.M. at 2192; app. at 77-78, 669-70, 2761, 2764-70. This high proportion of long-term fixed-rate debt exposed Colgate to risk in the event of declining
interest rates, as Colgate would receive diminished returns from its cash balances and short-term deposits, but would continue to owe interest on its debts at the higher fixed rate.

6

debt acquisition strategy without alerting potential acquirors to the internal accumulation of debt issues which, by increasing the capacity for internal leverage, would increase Colgate's vulnerability to a hostile takeover bid. See 73 T.C.M. at 2192-93; app. at 101, 3249-50, 1921-26, 2793-99, 2810, 2819-20, 3255-61. Thus, the acquisition of Colgate debt through the partnership would allow Colgate to use partnership capital to acquire its debt issues immediately at advantageous prices, then to retire and reissue the debt when market conditions were more favorable. In the interim, the debt effectively would be retired because Colgate would not owe the obligations thereon to third parties, yet the debt would remain outstanding for accounting purposes, reducing Colgate's vulnerability to potential acquirors. See app. at 673; 73 T.C.M. at 2193.

On July 28, 1989, Merrill Lynch presented a proposed partnership transaction summary which incorporated Colgate's debt acquisition objectives into the tax reduction proposal involving the contingent installment sale which Merrill Lynch had presented to Colgate in May 1989. See app. at 678-79. Merrill Lynch revised its proposals throughout the summer and approached ABN about participating in the partnership with Colgate and Merrill Lynch. Merrill Lynch explained to ABN that the partnership would invest in Colgate long-term debt to serve Colgate's debt management objectives, would engage in a contingent installment sale, and would require ABN's participation for no more than 2-3 years. ABN agreed to meet with Colgate representatives in the middle of October 1989. See 73 T.C.M. at 2193-94.5

In a document dated August 17, 1989, Merrill Lynch set forth revisions to the planned partnership transactions which it had presented to Colgate on July 28, 1989. See app. at 275-77. This document, entitled "Revised

5. ABN was familiar with its role in the proposed transaction, as Merrill Lynch had approached ABN in early 1989 while it was developing the proposal and had sought ABN's participation in a similar partnership arranged on behalf of another Merrill Lynch client. See 73 T.C.M. at 2194; app. at 1670-75, 1103.

7

Partnership Transaction Summary," see app. at 263-67, set forth the following proposal incorporating both the contingent installment sales transaction which Merrill Lynch initially had proposed in May 1989 and the debt acquisitions which Merrill Lynch had incorporated in its July 28 proposal:[6]

1) A Colgate subsidiary contributes $30 million, A BN contributes $169.3 million and Merrill Lynch contributes $.7 million.

2) The partnership invests its entire $200 million capitalization in short-term, floating rate private placement securities as "Interim Investments prior to the acquisition of [Colgate] debt" which are to "earn a return greater than comparably rated commercial paper or bank deposits."

3) The partnership sells the short-term notes for a combination of cash and LIBOR-based notes and uses the cash to acquire Colgate debt. "The purpose of the LIBOR notes will be to partly hedge the interest rate sensitivity of long-term [Colgate] debt acquired by the Partnership."

4) The partnership exchanges a portion of the long – term Colgate debt for newly issued medium-term Colgate debt, pursuant to a provision which affords Colgate the option of making such exchanges through the partnership.

5) The partnership adjusts its LIBOR note holdings. If the partnership retains a substantial amount of long-term debt, the Partnership "would likely . . . acquire additional LIBOR-based assets or . . . other hedges to reduce interest rate sensitivity of Partnership assets. Alternatively, if a substantial amount of long-term [Colgate] debt is exchanged, the Partnership would

_____

6. The August 17 transaction summary referred to Colgate as "XYZ corporation," ABN as "Partner A," and Merrill Lynch as "Partner B." However, the identity of the parties is clear from the role that each of

them played in the ensuing transactions and from Pohlschroeder's testimony. See app. at 685. Except where there are direct quotations we have paraphrased the summary.

likely reduce its holding of LIBOR notes. Such a reduction would be necessary because the Medium-Term Debt, received in exchange for long-term [Colgate] debt, is less interest rate sensitive than the long-term [Colgate] debt. LIBOR Notes may either be sold directly or distributed to one or more Partners in a non-liquidating distribution."

6) If the partnership has not invested all of its capital in Colgate debt and LIBOR instruments, the partnership "may liquidate some or all of the remaining Short-Term Notes and distribute the proceeds to one or more of the partners."7

7) "Possible redemption of [ABN's] Partnership interest. Commencing one year after formation of the Partnership, [ABN] has the right to have its Partnership interest redeemed by the Partnership . . . . The Partnership may redeem [ABN] in kind with Partnership property of its choosing or in cash. For example, assuming no change in asset values, the Partnership could borrow $169.3 million collateralized by its assets and use the proceeds to redeem [ABN]."

8) "If [ABN] is redeemed, the Partnership must be consolidated with [Colgate] for financial reporting purposes. Accordingly, all assets, including [Colgate] debt . . . will appear on the [Colgate] consolidated balance sheet. The [Colgate] debt will be effectively retired at that time. . . . [I]f the [Colgate] debt were acquired at a premium or a discount, [Colgate] would recognize a loss or gain, respectively, for income statement purposes. It would be most reasonable for the Partnership to sell the LIBOR Note . . . if[ABN] is redeemed. Since the principal asset of the Partnership, other than LIBOR Notes . . . is likely to be [Colgate] debt and [Colgate] would be a 98% partner, the hedge protection provided by the LIBOR Notes . . . is no longer necessary."

_____

7. This item was designated "Step 7." "Step 6" addressed a possible investment in Colgate receivables as an alternative to the LIBOR notes. Because ACM did not invest in Colgate receivables, this aspect of the proposal is immaterial.

9) "After a period of years it might be advanta geous for [Colgate] affiliates to purchase [Merrill Lynch's] Partnership interest. Alternatively, the Partnership might be liquidated with [Colgate] receiving [Colgate] debt as proceeds of the liquidation."

App. at 275–77. The final page of that document addressed the tax considerations of the arrangement and stated,

the liquidation of $200 million of Short-Term Notes in exchange for approximately $140 million of cash and $60 million market value of LIBOR notes should result in approximately $106 million of gain to the Partnership. 15% of such gain, $16 million, will be allocable to [Colgate]. If . . . LIBOR notes are distributed to [Colgate], each $10 million market value of the LIBOR notes distributed should have a tax basis of approximately $28 million. In a succeeding tax year, the Partnership will recognize a loss on sale or at maturity of the remaining LIBOR Notes. 98% of such loss will be allocable to [Colgate] because [Colgate] will be a 98% partner at such time. Combined, losses on sale of LIBOR Notes distributed to [Colgate] and losses on sale of LIBOR Notes by the Partnership should exceed $106 million. Accordingly, [Colgate] should recognize a net loss of approximately $90 million. After discounting and transactions costs . . . the transaction produces over $20 million present value benefits to [Colgate].

App. at 279.

A representative of ABN's legal department testified that the partnership, as he understood it, was to:

enter into transactions that would create a capital gain and in a later stage a capital loss, and that . . . depending on the percentage of your participation, you would either take part in the gain or the loss. So by having us being the majority partner at the start, we would take the majority of the gain, while in a later stage one of the other partners would take the loss.

App. at 1298.

In a memorandum dated October 3, 1989, Pohlschroeder

recommended the partnership to Colgate Treasurer Brian Heidtke. See App. at 310–21. Pohlschroeder outlined the advantages of repurchasing outstanding Colgate debt through a partnership, and stated that "[t]he partnership would temporarily invest the funds in some short-term instruments and, at the same time, start the repurchasing program." App. at 312. The memorandum identified three sets of Colgate debt issues targeted for repurchase: 1) a set of 9.625% 30-year notes due in 2017 ("Long Bonds"); 2) a set of Eurodollar debentures due in 1996 ("Euro notes"); and 3) a set of 8.4% private placement notes held by Metropolitan Life Insurance Company ("Metropolitan") and due in 1998 ("Met Notes"). The memorandum stated that "pursuant to an inquiry to Metropolitan, we feel confident that the partnership can purchase sufficient Colgate debt" to carry out the proposed plan. App. at 313–14.[8]

The memorandum's "Interest Rate Outlook" predicted that although the Federal Reserve Bank was not expected to "quickly lower interest rates in the near future," it was expected to "reduce the . . . rate" by late 1989 or early 1990 to a level that would allow Colgate to "lock in attractive medium term interest rates." App. at 311. The memorandum then analyzed the impact of a one to two percent interest rate increase or decrease on the LIBOR notes and the Colgate debt issues that the partnership expected to acquire. According to the analysis, a given decrease in interest rates would increase the value of the long-term Colgate debt and decrease the value of the LIBOR notes in roughly equal and offsetting amounts because the value of the LIBOR notes was directly dependent on interest rates whereas the value of the fixed-rate debt issues was inversely proportional to interest rates. See app. at 951–52, 313. Thus, the memorandum concluded, "the LIBOR note is an effective hedge of fixed rate assets for the partnership." App. at 313. The memorandum stated that it would be necessary to establish a "Desired Hedge Ratio" of LIBOR holdings to long-term debt holdings, so that the

_____

8. Pohlschroder testified that as of August 1989, he had received calls from traders indicating that the Long Bonds also were potentially available for purchase. See app. at 688.

partnership's assets would be "fully hedged" against changes in value due to interest rate fluctuations. App. at 314.

The memorandum recommended that Colgate proceed with the partnership as a means "to actively manage its

liability structure," and stated that the "Next Steps" after executing a partnership agreement, establishing the partnership in a "Foreign Jurisdiction" and funding the partnership were the following:

    —Short—term investment securities acquired.

    — . . . . Disposition of short—term investment securities to fund acquisition of Colgate debt.

App. at 321.

In a document marked "REVISED 9/1/89," Merrill Lynch provided Colgate a "Cost Component Analysis," which estimated after-tax costs associated with the proposed acquisition and disposition of short—term notes and acquisition of LIBOR notes. Merrill Lynch estimated that the short—term notes would entail an "origination" cost of $1.32 million, while the "remarketing" of the LIBOR notes would cost $1.29 million in addition to $.17 million in legal expenses and $1.32 million in Merrill Lynch advisory fees. See app. at 294.

A September 20, 1989 document delineated the details of the proposed partnership transactions and their anticipated tax consequences under I.R.C. S 453 and the ratable basis recovery rule, Temp. Treas. Reg. S 15a.453. See app. at 296–308. The document contemplated using the partnership's $200 million in cash investments to acquire short—term notes, see app. at 303, disposing of the short—term notes in exchange for $140 million in cash and LIBOR instruments which would generate contingent payments with a present value of $60 million, and using the $140 million in cash to purchase Colgate debt. App. at 300–01, 304–05. Because the partnership was to receive payments on the exchange over the course of six years, the $200 million basis in the short—term notes was to be recovered ratably over six tax years in equal increments of $33.3 million per year pursuant to S 15a.453. Thus, according to

12

this document, the transaction would result in significant capital gains in the first year, consisting of the $106.7 million difference between the $140 million cash received that year and the $33.3 million basis recovered that year, and would result in capital losses in each of the ensuing years because the contingent payments received in each of those years considering imputed interest would fall short of the $33.3 million basis to be recovered in each of those years. See app. at 301. The aggregate projected capital losses in the ensuing years equaled precisely the amount of

capital gains reported in the first year, and the document stated that the recognition of those losses "may be accelerated in any year subsequent to 1989 by sale of the remaining LIBOR notes." App. at 301.

The document also contemplates Colgate's increasing its share in the partnership from 15% to 97% after the partnership recognized the $106.7 million capital gain in year 1 but before it recognized the capital losses in the ensuing years. See app. at 305-08. According to the document, the LIBOR notes eventually would be sold for a capital loss of $80 million, 97% of which would be allocated to Colgate based on its 97% partnership interest by the time the loss was incurred. See app. at 304, 308-09.

At an October 12, 1989 meeting of Colgate's Board of Directors, the Directors considered the proposal and stated that it:

> had originally been presented . . . with a view toward minimizing the capital gains tax arising out of the disposition of the Kendall business. However, major changes were made . . . so that the program would provide the important business advantages of accumulating [Colgate] debt in friendly hands and permitting [Colgate] to obtain flexibility in managing the ratio balance between short and long term debt and the resulting interest exposure. Without these treasury advantages, management would not have recommended this transaction.
>
> . . . . Over the life of the partnership, significant tax benefits should be generated for Colgate, but even without these benefits, Colgate would earn a pre-tax return of approximately 6% on its investment.

13

App. at 337. According to Steven Belasco, Colgate's Vice President of Taxation, the incorporation of Colgate's debt acquisition objectives into Merrill Lynch's initial proposal afforded sufficient business advantages to overcome Colgate's hesitations about Merrill Lynch's initial proposal which served only the tax objectives of generating a capital loss to offset 1988 capital gains. See app. at 1235-36.

B. The Partnership

In late September and early October 1989, as Colgate was contemplating final approval of its participation in the proposed partnership, Merrill Lynch was finalizing arrangements for ABN's participation in the partnership. An

ABN document dated October 11, 1989, stated that it would agree to enter the partnership on the conditions that: 1) "[t]he timing of the purchases and sales of the various securities be adhered to as proposed;" 2) "Colgate's obligation to purchase Kannex's interest in the partnership . . . is unconditional;" and 3) Merrill Lynch agrees to repurchase the securities "at par on November 29, 1989." 73 T.C.M. at 2197; app. at 1061, 1064–65.9

Between October 24 and October 27, 1989, ABN established Kannex, Colgate established Southampton, and Merrill Lynch established MLCS to participate in the ACM partnership. See 73 T.C.M. at 2197; app. at 81–84, 89–91. The October 27, 1989 partnership agreement among these newly created entities provided that Kannex was to receive a preferred return of the first $1.24 million in any partnership profits otherwise allocable to Southampton. See app. at 101; 73 T.C.M. at 2198–99.10

_____

9. The document referred to the securities as "MTNs" or medium–term notes. However, it is apparent from the November 29, 1989 date by which those notes were to be resold that these were the same securities which the partnership was to purchase initially and dispose of shortly thereafter in exchange for cash which would be used to purchase Colgate debt and for LIBOR notes. See app. at 321, 300–05.

10. This "preferred return" provision was a component of the proposed partnership from its inception. In a document dated September 1, 1989, Merrill Lynch advised Colgate that this aspect of the partnership would cost Colgate $740,000. See app. at 294.

14

On October 27, 1989, after executing the partnership agreement, the partners met and authorized Merrill Lynch to find willing sellers of Colgate debt issues, including the Euro Notes, Met Notes, and Long Bonds which had been identified in Pohlschroeder's October 3 memorandum. See app. at 313, 386. The partners resolved that "in order to maximize the investment return on its assets pending the acquisition" of these debt issues, Merrill Lynch was authorized "to arrange the purchase (in a private placement) of $205 million of . . . unsecured debt." App. at 386–87.

The minutes of the partnership meeting reported that Colgate's treasury department had contacted Metropolitan with a proposal to purchase $100,000,000 of the Met notes, and that Metropolitan "if interested, would come to Bermuda on November 17, 1989 in order to negotiate and make final such transaction." App. at 387. 11 Earlier in the

fall of 1989, Pohlschroeder had initiated discussions with Metropolitan about selling the notes after Metropolitan contacted him to express concern about certain terms in the notes. See app. 690-91, 742. Before the November 17 meeting, a Metropolitan representative left Pohlschroeder a message indicating the price at which Metropolitan was prepared to sell the Met notes. Pohlschroeder did not respond to the call. See 73 T.C.M. at 2200; app. at 883. Pohlschroeder previously had conferred with Merrill Lynch's Henry Yordan about acquiring the Met Notes, Euro Notes, and Long Bonds. See app. at 117-18; 73 T.C.M. at 2200. Pohlschroeder's handwritten memorandum of the conversations regarding the Met notes concludes with a notation of the date November 17, while his notations regarding the acquisition of the Long Bonds and Euro Notes state that Kannex would instruct Merrill Lynch after purchase of Citicorp notes which, as discussed below, were to serve as the initial short-term investment contemplated in the partnership proposals. 73 T.C.M. at 2200; app. at 880; 889-90.

_____

11. Pohlschroeder had contacted Metropolitan shortly after the first partnership meeting in October 1989 and had instructed Metropolitan to send a representative to the November 17 meeting if Metropolitan was interested in selling the Met notes. See app. at 743.

15

C. The Transactions

On November 2, 1989, Kannex contributed $169.4 million, Southampton contributed $35 million, and MLCS contributed $0.6 million to the newly created ACM partnership for a total partnership capitalization of $205 million. See app. at 98. Based on these contributions, Kannex held an 82.6% share of the partnership, Southampton held a 17.1% share, and MLCS held a 0.3% share. 73 T.C.M. at 2197; app. at 98. ACM deposited the $205 million in an account at ABN's New York branch paying interest at an annual rate of 8.75%. ACM withdrew the funds the following day and purchased ten private placement Citicorp notes in an aggregate amount of $205 million. The Citicorp notes paid interest monthly at a floating rate that was to be reset monthly. The initial rate was 8.78%, three basis points above the rate the funds were earning in the ABN account.12 On November 15, 1989, Citicorp made an interest payment and reset the interest rate to 8.65%. 73 T.C.M. at 2200.

In late October 1989, before ACM's November 3 acquisition of the Citicorp notes, Merrill Lynch had

approached Bank of Tokyo ("BOT") and Banque Francaise du Commerce Exterieure ("BFCE") to negotiate selling them those notes.13 During the first week of November, Merrill Lynch forwarded BOT and BFCE specific terms of the proposed sale in which those two banks would purchase an aggregate of $175 million of the notes for $140 million in cash plus LIBOR notes providing for a five-year stream of quarterly payments with a net present value of approximately $35 million. See 73 T.C.M. at 2200; app. at 107-08.14 On November 9, 1989, BOT representatives

_____

12. A basis point, a common unit of measure for interest rates, equals one one-hundredth of a percent.

13. Pohlschroeder testified that ACM expected to sell the Citicorp notes for cash and LIBOR notes within several weeks to make the cash available to purchase Colgate debt. App. at 739-40. Pohlschroeder also stated that the Citicorp exchange was designed "to accomplish a tax aspect of the transaction." App. at 740.

14. In negotiating the transactions with BOT and BFCE, Merrill Lynch also agreed to arrange a series of swaps which would hedge the banks' interest rate risks and provide them additional return on their purchase of the Citicorp notes. See 73 T.C.M. at 2206-10.

16

requested approval from their head office, attaching documents which set forth "all details of the transaction." On November 10, 1989, Merrill Lynch confirmed that it would sell $125 million in Citicorp notes to BOT and $50 million to BFCE. See app. at 111-14; 73 T.C.M. at 2200.

On November 17, 1989, ACM convened its second partnership meeting in Bermuda. A Metropolitan representative attended pursuant to Pohlschroeder's invitation to attend if interested in selling the Met Notes. After brief negotiations, ACM and Metropolitan agreed that ACM would purchase $100 million principal amount of Met Notes effective December 4, 1989. App. at 118-19, 390; 73 T.C.M. at 2201. Pohlschroeder stated that ACM would need to raise cash by the time of the December 4 purchase and that the acquisition of long-term fixed-rate debt "would create a risk to the partnership in the event that interest rates increased." Accordingly, he recommended that ACM "hedge its risk by purchasing notional principal contracts with a floating rate of interest." App. at 391. ACM thus resolved "to arrange the sale of $175 million principal amount of Citicorp Notes" to BOT and BFCE "for cash and other LIBOR-based consideration, upon substantially the terms of a draft Installment Purchase Agreement presented

to the meeting . . . in order to pay Metropolitan the amounts to be due . . . and to hedge . . . exposure to interest rate changes." App. at 391.

ACM completed the sale of the Citicorp notes on November 27, 1989, in accordance with the terms which Merrill Lynch had negotiated by November 10 and which ACM had approved on November 17, selling $125 million of the notes to BOT and $50 million of them to BFCE for a total of $140 million in cash and eight LIBOR notes issued by BOT and BFCE. The LIBOR notes provided for a stream of 20 quarterly contingent payments commencing on March 1, 1990, whose amount was derived from the three-month LIBOR multiplied by a notional principal amount of $97.76 million.15

_____

15. The notional principal amount did not represent an amount owed, but rather was designated as a multiplier to determine the amount of the LIBOR-based contingent payments.

17

In exchange for the $175,000,000 Citicorp notes, ACM received consideration totaling $174,410,814, which represented the $175,000,000 value of the Citicorp notes, reduced by the $1,093,750 in transaction costs for arranging the sale of these illiquid private placement instruments, but increased by the $504,564 in interest that had accrued on the Citicorp notes during the 12 days since their last interest payment on November 15. Accordingly, the LIBOR notes effectively cost ACM $35,504,564, the difference between the $175,504,564 in value which ACM relinquished and the $140,000,000 in cash which ACM received in return, but had a present value of $34,410,814 to reflect the $1,093,750 in transaction costs. See 73 T.C.M. 2201 02, 2206-10; app. at 751. The LIBOR notes issued by BOT accounted for $25,360,403 of the aggregate cost and $24,579,153 of the aggregate present value, while those issued by BFCE accounted for $10,144,161 of the aggregate cost and $9,831,661 of the aggregate present value of the LIBOR notes acquired in the exchange. See 73 T.C.M. at 2201.

Upon selling the Citicorp notes on November 27, ACM invested the $140 million in cash proceeds in time deposits and certificates of deposit due seven days later on December 4, 1989, and bearing interest at 8.15% to 8.20%. In several transactions between December 4 and 8, ACM purchased Colgate debt including $100 million of the Met Notes pursuant to the November 17 agreement, $5 million of the Euro Notes, and $31 million of the Long Bonds. See

app. at 118-20. ACM purchased an additional $18.75 million in Colgate long-term debt issues between June and October 1990. See 73 T.C.M. at 2205; app. at 119-20, 122-23.

During the weeks preceding ACM's November 27 acquisition of the LIBOR notes, Merrill Lynch began arranging to sell a portion of them. In a November 13, 1989 memorandum entitled "Analysis of Partnership Hedging Activity," Merrill Lynch stated that certain events would warrant a reduction in the desired amount of LIBOR holdings. Specifically, Merrill Lynch explained that if Southampton elected to increase its share of the partnership's interest rate risk, as it was entitled to do

18

under a provision of the partnership agreement, see app. at 101; 73 T.C.M. at 2198-99, or if ACM exchanged the Long Bonds for a new issue of five-year Colgate debt, ACM should reduce its LIBOR note holdings in light of its diminished need for their hedging function. See 73 T.C.M. at 2202. Merrill Lynch approached a major Danish bank, Sparekassen SDS ("Sparekassen"), offering it the BFCE LIBOR notes which totaled approximately $10 million, along with collateral swaps which provided Sparekassen risk protection and a return on its investment. On December 5, 1989, Sparekassen set aside a $10 million credit line in preparation for the transaction. See 73 T.C.M. at 2202.

At ACM's third partnership meeting on December 12, 1989, Southampton elected to increase its share of ACM's interest rate exposure and ACM exchanged a portion of the Long Bonds for shorter-term debt issues pursuant to "the terms of a Note Purchase Agreement presented to the meeting." See app. at 101, 396-97; 73 T.C.M. at 2205. Merrill Lynch advised that ACM decrease its LIBOR note holdings in light of these factors reducing its interest rate exposure. App. at 397. ACM resolved to distribute the BFCE LIBOR notes to Southampton as a return of contributed capital, and executed Assignment Agreements conveying those notes to Southampton. See app. at 124, 398.

On December 22, 1989, Southampton sold the BFCE notes to Sparekassen for aggregate consideration of $9,406,180, an amount $425,481 below the $9,831,661 present value of the notes when ACM acquired them on November 27. See app. at 125-26; 73 T.C.M. at 2201, 2202-03 & n.10. Of this discrepancy, $390,000 resulted from the transaction costs and bid-ask spread necessary to

market the LIBOR notes, while the remaining shortfall resulted from the decreased value of the notes due to the decline in interest rates since November 27 and from a quarterly payment on the notes which reduced their remaining value. See 73 T.C.M. at 2202; app. at 1560-61, 1628.

On June 25, 1991, Colgate acquired a 38.31% share in ACM from Kannex for $85,897,203.60 and Southampton

acquired an additional 6.69% share from Kannex for $15,000,000, giving Colgate-Southampton a majority interest in ACM. App. at 131-32, 414. Because it had acquired a majority interest in ACM, Colgate consolidated ACM's holdings with its own on its books, revealing its control of the debt issues which theretofore had remained outstanding on its books. See app. at 3249-50. ACM retained $30 million in Citicorp notes until October 16, 1991, when it put them to Citicorp at par pursuant to an option provision. ACM earned $4,329,191 of interest on the portion of the Citicorp notes which it held until 1991. See app. at 507-67, 570-98.

On November 27, 1991, ACM redeemed Kannex's remaining partnership interest for $100,775,915, leaving Colgate and Southampton with a combined 99.7% interest in ACM. App. at 137-38. At a December 5, 1991 partnership meeting, Merrill Lynch stated that because Colgate owned virtually the entire partnership, its "net economic exposure to the risk of interest rate fluctuations in the value of the Colgate debt was effectively minimal, and the Partnership need not maintain its position in the [LIBOR notes] to hedge against such exposure." App. at 408. Thus, Merrill Lynch explained, without the need for hedging, it was "unwise for the Partnership to hold" this "highly volatile investment" given the market's declining interest rates. ACM resolved to sell its remaining LIBOR notes, which were those issued by BOT, the BFCE LIBOR notes having been distributed to Southampton and subsequently sold to Sparekassen. App. at 409. On December 17, 1991, ACM sold the BOT LIBOR notes to BFCE for $10,961,581, a price that reflected a significant loss in value due to declining interest rates which had reduced the three-month LIBOR from 8.5% to 5.7% and transaction costs of $440,000 arising from the bid-ask spread needed to remarket the notes. See 73 T.C.M. at 2206; app. at 138.

D. Tax and Financial Accounting of the Transactions

On its partnership return for the tax year ended
November 30, 1989, ACM treated the November 27, 1989
exchange of the Citicorp notes as an installment sale under

I.R.C. S 453, as ACM was to receive part of the
consideration for that exchange "after the close of the
taxable year in which the disposition occurs" pursuant to
S 453(b)(1). App. at 109. Because the quarterly LIBOR note
payments would vary based on fluctuations in the LIBOR,
there was no "stated maximum selling price" that could be
identified "as of the close of the taxable year in which the
. . . . disposition occurs." Thus, the transaction came within
the terms of Temp. Treas. Reg. S 15a.453-1(c), whose
ratable basis recovery rule provides that the taxpayer's
basis "shall be allocated to the taxable years in which
payment may be received under the agreement in equal
annual increments."

Accordingly, ACM divided its $175,504,564 basis in the
Citicorp notes, consisting of their $175 million purchase
price and $504,564 of accrued payable interest, equally
among the six years over which payments were to be
received in exchange for those notes, and thus recovered
one sixth of that basis, or $29,250,761, during 1989.16
Subtracting this basis from the $140 million in cash
consideration for the Citicorp notes, ACM reported a 1989
capital gain of $110,749,239.42 which it allocated among
its partners according to their partnership shares, resulting
in an allocation of $91,516,689 of the gain to Kannex,
$18,908,407 to Southampton, and $324,144 to MLCS. See
app. at 109, 144-66; 73 T.C.M. at 2203. Southampton and
MLCS were subject to United States income tax on their
respective shares of the gain, but Kannex as a foreign
corporation was not. App. at 226-35.17

Under the ratable basis recovery rule the tax basis
remaining to be recovered over the following five years
became $146,253,803, representing the difference between

_____

16. ACM divided the basis across six years instead of five, although the
LIBOR payments were to be received over 20 quarters commencing in
1990, because it received the cash portion of the consideration three
days before the end of the 1989 tax year, making 1989 a year "in which
payment may be received" under S 15a.453.

17. According to the Tax Court the share allocated to Kannex was not
taxed in any jurisdiction but we, of course, are focusing only on the
United States tax aspects of the transaction.

the $175,504,564 value of the Citicorp notes which ACM relinquished to acquire those notes and the $29,250,761 in basis recovered during the first year of the transaction. See app. at 110. Of the $146,253,803 reported as the remaining unrecovered tax basis after 1989, $41,786,801 was attributable to the BFCE LIBOR notes, whose actual cost was $10,144,161, while $104,467,002 was attributable to the BOT LIBOR notes, whose actual cost was $25,360,403. See 73 T.C.M. at 2201, 2203 & n.11.

On its 1989 tax return, Southampton reported its $18,908,407 share of the capital gain from the $140,000,000 cash received in exchange for the Citicorp notes, and reported a $32,429,839 capital loss from its December 22, 1989 sale to Sparekassen of the BFCE LIBOR notes which it had received in the December 12, 1989 distribution from ACM.18 Because these capital losses completely offset the capital gains, Southampton reported a net 1989 capital loss of $13,521,432 and did not report any net tax liability on its share of ACM's gain from the disposition of the Citicorp notes. See 73 T.C.M. at 2203.

ACM retained the Curacao office of Arthur Andersen & Co. as its accountants. In reviewing ACM's financial and tax accounting for 1989, the Arthur Andersen auditors noted that ACM's records were inconsistent in their treatment of the $1,093,750 spread between the amount of consideration ACM had paid for the LIBOR notes and their market value at the time of acquisition. Specifically, the auditors noted, ACM had not accounted for this transaction cost in its income statement, but had included it in the book value of the LIBOR notes contrary to a provision in the partnership agreement requiring that assets be recorded at fair market value. Due to this discrepancy, ACM's records effectively overstated the market value of the LIBOR notes and understated the transaction costs involved in acquiring them through the contingent installment sale. See 73 T.C.M. at 2204.

_____

18. This $32,429,839 loss was computed based upon the $9,406,180 cash proceeds from the sale, minus the $41,786,601 tax basis in the notes, minus $48,693 in accrued interest payable on the notes. See 73 T.C.M. at 2203.

The audit manager wrote the following memorandum in

February 1990 to his colleagues regarding the discrepancy:

> Colgate does not want the cost to sell [the Citicorp notes] of US $1,093,750 . . . in the . . . income statement of ACM. The reasons are mainly tax driven, as inclusion might set the IRS on top of the reasons why the partnership was constructed in the first place and thus the planned tax losses might be denied by the IRS. We . . . were requested to think with Colgate in order to keep the cost to sell out of the balance sheet.

Id.; see also app. at 141. Arthur Andersen proposed that to avoid accounting for the costs associated with the LIBOR notes, ACM could continue to record the transaction costs as part of the value of the LIBOR notes and could resolve the conflict with the market valuation provision of the partnership agreement by issuing "a side letter to the partnership agreement stating that the LIBOR notes are the one exception to the valuation rules which now state valuation at market and would . . . then state valuation at market increased by the cost to sell the original Citicorp notes." Id.

At its February 28, 1990 partnership meeting, ACM adopted this approach and enacted special valuation rules which provided that the LIBOR notes, unlike other partnership assets, would be valued on ACM's books "at cost" rather than at market value and would be adjusted upon distribution of the note to a partner, redemption of the partnership interest of any partner, or liquidation of the partnership. See app. at 402, 407.[19] This provision effectively transferred the transaction costs associated with exchanging the Citicorp notes for LIBOR notes to the partner that eventually received the notes in a distribution, as the market value would be less than the reported value of the distribution. See 73 T.C.M. at 2204. Thus, ACM's December 12, 1989 distribution of the BFCE LIBOR notes

---

19. The rules described the LIBOR notes as the "[c]ontingent payment notes with no stated principal value, with payments resulting from the product of a notional amount and a floating rate of interest." App. at 407.

effectively passed those transaction costs to Southampton in accordance with the partners' understanding that Colgate and Southampton would bear the transaction costs associated with trading private placement notes. See app. at 1622–25.

For its tax year ended December 31, 1991, ACM reported a capital loss of $84,997,111 from its December 17, 1991 sale of the BOT LIBOR notes.[20] This loss consisted of the difference between the $10,961,581 that ACM received for those notes and the remaining $95,958,692 basis in those notes. App. at 202–25. Of this amount of loss, $5.8 million resulted from a decline in the value of the LIBOR notes due to declining interest rates while $79,106,599 resulted from the application of the ratable basis recovery rule which effectively added to the tax basis of the LIBOR notes 5/6 of the $140 million value of the Citicorp notes which had been exchanged for cash. See 73 T.C.M. at 2206. [21] Because Colgate, together with its subsidiary Southampton, by that time owned 99.7% of the partnership, Colgate claimed 99.7% of the $84,997,111 capital loss on its 1991 return for a total capital loss of $84,537,479. App. at 247–51. Colgate then filed an amended 1988 return reporting this

_____

20. This appeal concerns adjustments to ACM's 1989 and 1991 tax returns. Although the Commissioner's Final Partnership Administrative Adjustment and the Tax Court's decision made adjustments to ACM's 1990 tax return, these adjustments affected only the basis in certain assets with no effect on net tax liability for 1990. See app. at 3444. Thus, we do not discuss the 1990 return further.

21. Had it not applied the ratable basis recovery rule, ACM would have subtracted from the consideration it received upon disposition of the BOT LIBOR notes only the remaining portion of the LIBOR notes' aggregate $35,504,564 actual cost basis rather than the remaining portion of their aggregate $175,504,564 tax basis which ACM derived by aggregating the $140 million cash portion of the Citicorp note transaction with the $35 million LIBOR note portion of the transaction and adjusting the aggregate basis for accrued interest, yielding $95,958,692 in unrecovered basis at the time of the disposition of the BOT LIBOR notes. ACM also treated a portion of the proceeds from the notes as interest income rather than capital gains. See 73 T.C.M. at 2206; app. at 3388.

24

loss as a carryback pursuant to I.R.C. S 1212 to offset a portion of its 1988 capital gains. See app. at 252–62.[22]

E. The Tax Court Decision

On March 12, 1993, the Commissioner of Internal Revenue ("Commissioner") issued ACM a Notice of Final Partnership Administrative Adjustment ("FPAA") eliminating ACM's $110,749,239.42 installment gain from the sale of the Citicorp notes in November 1989, redetermining ACM's

tax basis in the BFCE LIBOR notes distributed in December 1989, and disallowing the $84,997,111 capital loss deduction which ACM reported in 1991. See app. at 28-42. In writing this opinion we primarily focus on the capital loss aspects of the case, though it should be understood that the gain and loss are part of a single integrated plan. The Commissioner asserted in the FPAA that the transactions involving the purchase and sale of the Citicorp notes in exchange for cash and LIBOR notes, "were shams in that they were prearranged and predetermined. . .. [S]aid transactions were devoid of economic substance necessary for recognition for federal income tax purposes and were totally lacking in economic reality. The transactions were created solely for tax motivated purposes without any realistic expectation of profit." App. at 39. On May 24, 1993, Southampton, in its capacity as ACM's tax matters partner, filed a petition in the Tax Court contesting the Commissioner's adjustments.[23] ACM argued that its transactions

> were bona fide arm's length transactions at fair market value and had economic substance. . . . The purchase of the Citicorp notes on November 3, 1989, and the sale of a portion of the Citicorp notes on November 27, 1989, were not prearranged or predetermined, and both had economic substance. . . . . The sale of the

_____

22. This capital loss of $84,537,479, combined with Colgate's reported 1989 net capital loss of $13,521,432, gave rise to total reported capital losses of $98,058,911 over the course of Colgate's participation in ACM's transactions. See 73 T.C.M. at 2206.

23. A designated tax matters partner represents the partnership in proceedings before the Tax Court. See I.R.C. SS 6231(a)(7), 6226(a).

25

> Citicorp notes by ACM in exchange for fixed payments and contingent payments under the LIBOR Notes qualified for installment sale treatment under Treas. Reg. S 15a.453-1(c)(3).

App. at 25.

The Tax Court tried the case over a month-long period in 1996 and on March 5, 1997, issued a memorandum opinion upholding the Commissioner's adjustments on the grounds that "[a] taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance." 73 T.C.M. at 2215. In reaching the conclusion that ACM was not entitled to deduct its claimed capital

losses, the court examined the stated purposes and anticipated economic consequences of the transaction, and found that the claimed losses were "not economically inherent in" the transactions but rather were"created artificially" by machinations whose only purpose and effect was to give rise to the desired tax consequences. Id. On April 4, 1997, ACM moved for reconsideration of the court's opinion, arguing that the transactions had sufficient economic substance to be respected for tax purposes. See app. at 3311-47. The court denied the motion on June 9, 1997. See app. at 3439-41.

The parties filed memoranda, pursuant to Tax Court Rule of Practice and Procedure 155, regarding the computation of tax liability in accordance with the Tax Court's memorandum opinion. See app. at 3385-444. ACM proposed a computation which disallowed deductions for the losses resulting from its application of the ratable basis recovery rule but which allowed the deduction of approximately $6,000,000 in actual economic losses resulting from the loss in value of the LIBOR notes. See app. at 3348-51, 3385-98. In a decision entered June 12, 1997, the Tax Court rejected ACM's computations and eliminated the entire $84,997,111 capital loss reported in 1991 as well as the 1989 capital gains reported in the first year of the Citicorp note transaction. See app. at 3444. ACM filed a timely notice of appeal on September 8, 1997. See app. at 39-40. The Commissioner filed a protective cross appeal seeking to preserve the right to proceed on alternate theories for sustaining the adjustments in the

event that the Tax Court's application of the economic substance doctrine were reversed. See app. at 3447.24

III. DISCUSSION

A. Economic Substance and the Sham Transaction Doctrine

We must decide whether the Tax Court erred in disallowing ACM's claimed $110,749,239.42 capital gain in 1989 and its $84,997,111 capital loss which the court characterized as a "phantom loss from a transaction that lacks economic substance." 73 T.C.M. at 2215. While we conduct plenary review of the Tax Court's legal conclusions, we review its factual findings, including its ultimate finding as to the economic substance of a transaction, for clear error. See Fredericks v. Commissioner, 126 F.3d 433, 436 (3d Cir. 1997); Harbor Bancorp v. Commissioner, 115 F.3d 722, 727 (9th Cir. 1997), cert. denied, 118 S. Ct. 1035

(1998); Northern Indiana Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 510 (7th Cir. 1997); Ferguson v. Commissioner, 29 F.3d 98, 101 (2d Cir. 1994); Lukens v. Commissioner, 945 F.2d 92, 97 (5th Cir. 1991); Karr v. Commissioner, 924 F.2d 1018, 1022 (11th Cir. 1991); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985).25

ACM contends that, because its transactions on their face satisfied each requirement of the contingent

_____

24. Inasmuch as we agree with the Tax Court's decision sustaining the adjustments based on the lack of economic substance behind the transactions, we, like the Tax Court, need not consider the Commissioner's alternate theories. See 73 T.C.M. at 2190. In view of the elimination of the 1989 gain the parties apparently were spared from applying the complex mitigation provisions in the Internal Revenue Code. See Koss v. United States, 69 F.3d 705 (3d Cir. 1995), cert. denied, 117 S.Ct. 54 (1996).

25. We review findings of ultimate fact, like other findings of fact, only for clear error, contrary to our former practice of reviewing such findings de novo. See Geftman v. Commissioner, ___ F.3d ___, 1998 WL 460172, No. 97–7313, slip op. at 11 n.9 (3d Cir. Aug. 10, 1998); Pleasant Summit Land Corp. v. Commissioner, 863 F.2d 263, 268 (3d Cir. 1988).

27

installment sale provisions and regulations thereunder, it properly deducted the losses arising from its "straightforward application" of these provisions, which required it to recover only one sixth of the basis in the Citicorp notes during the first of the six years over which it was to receive payments. See Temp. Treas. Reg. S 15a.453–1(c).26 Thus, ACM contends, it properly subtracted the basis in the LIBOR notes to include the remaining five sixths of the basis in the Citicorp notes used to acquire them.27 Consequently, ACM argues it properly subtracted the approximately $96 million remaining unrecovered basis in the BOT LIBOR notes from the approximately $11 million consideration it received upon disposition of those notes, see br. at 32; app. at 202–03, and correctly recognized and reported the gains and losses arising from its sale or exchange of property in accordance with I.R.C. S 1001.

While ACM's transactions, at least in form, satisfied each requirement of the contingent installment sale provisions and ratable basis recovery rule,28 ACM acknowledges that

_____

26. Although the LIBOR notes generated 20 quarterly payments spanning five years rather than six, ACM reported the "maximum period over which payments may be received under the contingent sale price agreement" as six years by including the year of the disposition in which it received the $140 million cash payment, although no quarterly payments were to be received before the tax year ended on November 30, 1989, three days after the disposition. See 73 T.C.M. at 2200.

27. The basis in the LIBOR notes was derived from the basis in the Citicorp notes which ACM exchanged for the LIBOR notes. See I.R.C. S 1031(d). Because ACM recovered one sixth of the basis of the Citicorp notes, or $29,250,761, during the first year of the transaction, the basis in the LIBOR notes after that year was $146,253,283. See app. at 110. While the actual cost basis of the LIBOR notes amounted to the $35,504,564 difference between the value of the Citicorp notes that ACM relinquished and the $140 million in cash that ACM received in return, under the ratable basis recovery rule, the cash portion of the transaction was aggregated with the contingent exchange portion of the transaction, effectively adding the $140 million in cash to the tax basis of the LIBOR notes.

28. ACM exchanged the Citicorp notes, which as private placement securities were eligible for treatment under the contingent installment sale provisions, see I.R.C. S 453(k)(2)(A), for the LIBOR notes' stream of

even where the "form of the taxpayer's activities indisputably satisfie[s] the literal requirements" of the relevant statutory language, the courts must examine "whether the substance of those transactions was consistent with their form," br. at 21, because a transaction that is "devoid of economic substance . . . simply is not recognized for federal taxation purposes." Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991).

We begin our economic substance analysis with Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266 (1935), the Supreme Court's foundational exposition of economic substance principles under the Internal Revenue Code. In Gregory, as in this case, the transactions on their face satisfied "every element required by" the relevant statutory language. Gregory, 293 U.S. at 468, 55 S.Ct. at 267.29 The

_____

quarterly payments over 20 quarters so that "at least 1 payment" was to be "received after the close of the taxable year in which the disposition occurs." S 453(b). Because the amount of each quarterly payment would depend on the variable three-month LIBOR, the "maximum selling price" could "not be determined as of the close of the taxable year in which the . . . disposition occurr[ed]." Temp. Treas. Reg. S 15a.453-1(c). Accordingly, ACM's transactions satisfied the literal terms of each

requirement necessary to trigger the application of the ratable basis recovery rule providing for recovery of the basis of the relinquished assets "in equal annual increments" over each of the "taxable years in which payment may be received." S 15a.453-1(c).

29. We analyze the economic substance of ACM's transactions according to principles that were well established when the transactions occurred, but note that partnership transactions carried out on or after May 12, 1994, also would be subject to Treasury Regulations which provide that partnership transactions "must be entered into for a substantial business purpose," that the "[t]he form of each partnership transaction must be respected under substance over form principles," and that "the tax consequences . . . to each partner of partnership operations . . . must accurately reflect the partners' income agreement." Treas. Reg. S 1.701-2(a). These regulations further provide that "if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability . . . the Commissioner can recast the transaction for federal tax purposes" by determining that "[t]he partnership's items of income, gain, loss, deduction or credit should be

29

taxpayer, instead of transferring stock from her wholly-owned corporation directly to herself which would have generated taxable dividends, created a new corporation, transferred the stock to the new corporation, then liquidated the new corporation, transferred the stock to herself, and asserted that she had not recognized any taxable gain because she had received the stock"in pursuance of a plan of reorganization" within the meaning of I.R.C. S 112(g). Although the transactions satisfied each element of the statute, which defined "reorganization" as a transfer of assets between corporations under common control, the Court found that "[t]he whole undertaking, though conducted according to the [statutory] terms . . . was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization." Id. at 469, 55 S.Ct. at 268.

The Court stated that "if a reorganization in reality was effected" any "ulterior [tax avoidance] purpose . . . will be disregarded" and the transaction will be respected for tax purposes. Id., 55 S.Ct. at 267. The Court emphasized, however, that where the transactions merely "put on the form of a corporate reorganization as a disguise for concealing its real character" which was a "preconceived

_____

reallocated . . . or [t]he claimed tax treatment should otherwise be adjusted or modified." Treas. Reg. S 1.701-2(b).

The regulations set forth, as an example of a transaction whose tax consequences would be altered or disregarded thereunder, a transaction in which a foreign corporation, a domestic corporation, and a promoter form a partnership "[p]ursuant to a plan a principal purpose of which is to generate artificial losses and thereby shelter from federal taxation a substantial amount of income," and engage in a series of offsetting purchases and sales in which "any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes." Treas. Reg. S 1.701-2(d), Example 7. Because these regulations do not apply to ACM's transactions, which were completed well before the 1994 effective date of the regulations, we have no occasion to consider whether the economic substance analysis required under these regulations would differ from the analysis required under the judicially defined economic substance doctrines that we apply.

30

plan . . . not to reorganize a business," but rather "to transfer . . . . shares to the [taxpayer]," the transaction was not, in reality, "the thing which the statute intended." Viewed according to their substance rather than their form, the Court found, the transactions fell "outside the plain intent of the statute" and therefore could not be treated in accordance with their form without "exalt[ing] artifice above reality." Id. at 469-70, 55 S.Ct. at 267-68. Thus, pursuant to Gregory, we must "look beyond the form of [the] transaction" to determine whether it has the "economic substance that [its] form represents," Kirchman v. Commissioner, 862 F.2d 1486, 1490 (11th Cir. 1989), because regardless of its form, a transaction that is "devoid of economic substance" must be disregarded for tax purposes and "cannot be the basis for a deductible loss." Lerman, 939 F.2d at 45; accord United States v. Wexler, 31 F.3d 117, 122 (3d Cir. 1994).30

In applying these principles, we must view the transactions "as a whole, and each step, from the commencement . . . to the consummation . . . is relevant." Weller v. Commissioner, 270 F.2d 294, 297 (3d Cir. 1959); accord Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708 (1945). The inquiry into whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes turns on both the "objective economic substance of the transactions" and the "subjective business motivation" behind them. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990); accord Lerman, 939 F.2d at 53-54 (noting that sham transaction has been defined as a transaction that "has no business purpose or economic effect other than the creation of tax deductions" and holding that taxpayer was not entitled "to claim `losses' when none in fact were sustained"). However,

these distinct aspects of the economic sham inquiry do not

_____

30. The courts have distinguished between "shams in fact" where the reported transactions never occurred and "shams in substance" which "actually occurred but that lack the substance their form represents." Kirchman, 862 F.2d at 1492; accord Lerman, 939 F.2d at 49 n.6. Because it is undisputed that ACM's transactions actually occurred, we confine our inquiry to the question of whether their economic substance corresponds to their form.

31

constitute discrete prongs of a "rigid two-step analysis," but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes. Casebeer, 909 F.2d at 1363; accord James v. Commissioner, 899 F.2d 905, 908-09 (10th Cir. 1990); Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989). For the reasons that follow, we find that both the objective analysis of the actual economic consequences of ACM's transactions and the subjective analysis of their intended purposes support the Tax Court's conclusion that ACM's transactions did not have sufficient economic substance to be respected for tax purposes.31

_____

31. While it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, it is also well established that where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations. See, e.g., Gregory, 293 U.S. at 468-69, 55 S.Ct. at 267 ("if a reorganization in reality was effected . . . the ulterior purpose will be disregarded"), Northern Indiana Pub. Serv. Co., 115 F.3d at 512 (emphasizing that Gregory and its progeny "do not allow the Commissioner to disregard economic transactions . . . which result in actual, non-tax-related changes in economic position" regardless of "tax-avoidance motive" and refusing to disregard role of taxpayer's foreign subsidiary which performed a "recognizable business activity" of securing loans and processing payments for parent in foreign markets in exchange for legitimate profit); Kraft Foods Co. v. Commissioner, 232 F.2d 118, 127-28 & n.19 (2d Cir. 1956) (refusing to disregard tax effects of debenture issue
which "affected . . . legal relations" between taxpayer and its corporate

parent by financing subsidiary's acquisition of venture used to further its
non-tax business interests). In analyzing both the objective and subjective aspects of ACM's transaction in this case where the objective attributes of an economically substantive transaction were lacking, we do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations.

32

1. Objective Aspects of the Economic Sham Analysis

In assessing the economic substance of a taxpayer's transactions, the courts have examined "whether the transaction has any practical economic effects other than the creation of income tax losses," Jacobson v. Commissioner, 915 F.2d 832, 837 (2d Cir. 1990) (citations and internal quotations omitted), and have refused to recognize the tax consequences of transactions that were devoid of "nontax substance" because they "did not appreciably affect [the taxpayer's] beneficial interest except to reduce his tax." Knetsch v. United States, 364 U.S. 361, 366, 81 S.Ct. 130, 135 (1960). In Knetsch, the taxpayer had purchased annuity savings bonds from an insurance company, borrowed virtually their entire value against them, made payments back to the insurance company, and characterized those payments as deductible interest. Because the borrowing against the bonds had reduced their value to a mere "pittance," leaving the taxpayer with nothing of value apart from tax deductions, the Court concluded that the net effect of the transfers between the taxpayer and the insurance company amounted only to payment of a "fee for providing the facade of `loans' whereby the [taxpayers] sought to reduce their . . . taxes" and therefore could not be characterized as payment of interest on a debt. Id. at 366, 81 S.Ct. at 135 (citation and internal quotation omitted).

In Weller, 270 F.2d 294, we examined a similar series of transactions in which the taxpayer purchased annuity policies, pledged them as collateral to borrow funds, used the borrowed funds to prepay future annual premiums on the policies, prepaid `interest' on an anticipated additional loans against the policies, then used the proceeds of the additional loans to repay the earlier loans, and sought to deduct the prepayments as interest. See id. at 295-96. Applying Gregory, we disallowed the deduction on the grounds that "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration" if they "do not appreciably change the taxpayer's financial position." Id. at 297 (citations and

internal quotations omitted). We therefore disregarded the transactions for tax purposes even though the taxpayer had

made actual payments which satisfied the statutory definition of an "amount paid . . . on indebtedness incurred . . . to purchase a single premium life insurance contract," much as the Supreme Court had disregarded the transaction in Gregory despite the fact that the taxpayer had created "a real, valid, corporate entity" and carried out a transaction that was "within the terms of the statute." Id. at 296-98.

In the context of property dispositions, the courts have applied the economic substance doctrine in a similar manner to disregard transactions which, although involving actual transactions disposing of property at a loss, had no net economic effect on the taxpayer's economic position, either because the taxpayer retained the opportunity to reacquire the property at the same price, or because the taxpayer offset the economic effect of the disposition by acquiring assets virtually identical to those relinquished. See, e.g., Lerman, 939 F.2d at 48; Merryman v. Commissioner, 873 F.2d 879 (5th Cir. 1989); Kirchman, 862 F.2d at 1488, 1492-93; Yosha v. Commissioner, 861 F.2d 494, 501 (7th Cir. 1988). Although the taxpayers in these cases actually and objectively disposed of their property, the courts examined the dispositions in their broader economic context and refused to recognize them for tax purposes where other aspects of the taxpayers' transactions offset the consequences of the disposition, resulting in no net change in the taxpayer's economic position. In light of these cases, we must determine whether the Tax Court erred in concluding that ACM's exchange of the Citicorp notes for contingent-payment LIBOR notes which gave rise to the tax consequences at issue generated only "a phantom loss" that was not "economically inherent in the object of the sale" and did not have "economic substance separate and distinct from economic benefit achieved solely by tax reduction." 73 T.C.M. at 2215. For the following reasons, we conclude that it did not.

2. Objective Economic Consequences of ACM's Transactions

While the Tax Court's analysis focused on the lack of non-tax purposes behind ACM's transactions rather than

on their objective economic consequences, the court made numerous findings that were indicative of the lack of objective economic consequences arising from ACM's short-swing acquisition and disposition of the Citicorp notes between November 3 and November 27, 1989. The court noted that ACM sold the Citicorp notes "for consideration equal to [their] purchase price" and thus did not realize any gain or loss in the notes' principal value. 73 T.C.M. at 2215 n.19.[32] Moreover, as the court observed, the lack of change in principal value was not merely coincidental, but was inherent in the terms of the notes and of the transactions in which they were traded. See id. at 2219–20. Likewise, the court found that the interest income generated by the notes could not have a material effect on ACM's financial position because the Citicorp notes paid interest at a rate that varied only nominally from the rate that ACM's cash contributions "were already earning . . . in . . . deposit accounts before the notes were acquired," resulting in only a $3,500 difference in yield over the 24-day holding period, a difference which was obliterated by the transaction costs associated with marketing private placement notes to third parties. Id. at 2218, 2220–21.

_____

32. As contemplated in transaction proposals drafted before ACM was formed, the Citicorp notes were sold for an amount equal to their purchase price. See app. at 275–77, 321, 300.